264 F.3d 860 (9th Cir. 2001)
 UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
REAL PROPERTY LOCATEDAT 22 SANTA BARBARA DRIVE, DEFENDANT,
AND
ADALINE B. GARCIA; DARNELL GARCIA; MARK A. BORENSTEIN; OPINION TUTTLE & TAYLOR; OVERLAND, BERKE, WESLEY, GITS, RANDOLPHAND LEVANAS, A CALIFORNIA PROFESSIONAL CORPORATION, CLAIMANTS-APPELLANTS.
 No. 99-57000
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 5, 2001--Pasadena, California
Filed September 5, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Counsel Mark A. Borenstein, Shapiro, Borenstein & Dupont, Santa Monica, California, for the claimants-appellants.
 John E. Lee, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California Manuel L. Real, District Judge, Presiding D.C. No. CV-89-03560-MLR
 Before: Dorothy W. Nelson, Ferdinand F. Fernandez and Pamela Ann Rymer, Circuit Judges.
 
 D. W. Nelson, Circuit Judge
 Opinion by Judge D.W. Nelson
 
 1
 Claimants Adaline and Darnell Garcia and their attorneys appeal a judgment of forfeiture for the United States. They argue that the district court (1) erred by denying damages for the wrongful seizure of the Garcias' home; (2) abused discretion by dismissing the attorney-claimants' claims; (3) erroneously found probable cause for the seizure; (4) improperly admitted Swiss bank records in the probable cause hearing; (5) improperly limited the claimants' questioning of DEA and IRS agents; (6) abused discretion by refusing to grant the claimants' motion in limine to exclude evidence that Adaline Garcia was not an innocent spouse; (7) violated the claimants' due process rights; and (8) excessively fined the claimants in violation of the Eighth Amendment. The claimants further argue that if we order a remand, the case should be assigned to another district judge.[1] We affirm.
 
 FACTS
 
 2
 The facts and procedural history of this case have a degree of complexity worthy of Jarndyce v. Jarndyce. On June 13, 1989, the government filed a complaint for forfeiture in rem against Darnell and Adaline Garcia's house in Rancho Palos Verdes, California, pursuant to 21 U.S.C. §§ 881(a)(6), which subjects to forfeiture the proceeds traceable to drug transactions. On the same day, the government filed a lis pendens in federal court, giving notice that the forfeiture action had commenced. On June 16, 1989, the United States Marshal seized the defendant property and filed a notice with the district court that "all persons claiming the said described defendant . . . file their Claims . . . with the Clerk of the United States District Court . . . within Twenty (20) days after date of first publication, or within such additional time as the Court may allow . . . ."
 
 
 3
 The forfeiture complaint alleged that Darnell Garcia, a DEA agent, had led a double life as a drug dealer and that he purchased his house with drug proceeds. More than nine years later, a probable cause hearing was held (the procedural history from 1989 to the present will be discussed below). DEA and IRS Special Agents Bradley Reed and Frank Fotinatos testified about what the government knew before the forfeiture complaint was filed.
 
 
 4
 According to Reed, the DEA's investigation began with allegations made against another DEA agent, John Jackson. First, the DEA took statements from two brothers, Larry and Anthony Goodman, who bought many kilos of cocaine from their brother-in-law, Sherman Lair. Larry Goodman said in 1986 that Lair told him that Jackson was the source of the cocaine and that Jackson had partners "who were involved with law enforcement, but he didn't know who they were." Larry Goodman later gave a videotaped deposition at Jackson and Lair's attorney's office recanting that statement, but he then told prosecutors that he was pressured into recanting and that his original statement was true.
 
 
 5
 Jackson was implicated in three thefts of cocaine and heroin. In the first theft, Jackson submitted one kilo of heroin to the drug evidence custodian at the DEA after his group seized it, but the heroin was discovered missing on or about October 5, 1984. Jackson and Darnell Garcia refused polygraph tests. Second, in January 1985, Jackson worked on a case involving the seizure of 15 pounds of heroin. Jackson transported the heroin from the site of the bust to the DEA office and was responsible for processing the drugs and submitting them to the evidence vault. When the DEA's lab weighed the drugs, however, three pounds were missing. Third, according to Anthony Goodman's statement to the DEA, Jackson and his partners acquired 150 kilograms of cocaine some time in 1985-86.
 
 
 6
 According to Reed, Anthony Goodman said that Lair told him that one of Jackson's partners "was a Mexican who acted black, and who was in the jewelry business. And that was just the perfect description of Darnell Garcia." Even though Garcia and Jackson were in different DEA groups, they were repeatedly identified as associating with each other. In March 1986, Garcia rented an apartment in downtown Los Angeles and always paid in cash. The security chief of the apartment building told investigators that Jackson was constantly visiting Garcia, as were Ron and Conway Waddy and their girlfriends. The Waddy brothers were indicted on cocaine and money laundering charges in 1987, and one girlfriend was later caught in possession of 42 kilos of cocaine after having spent the night at a hotel across the street from Garcia's apartment.
 
 
 7
 Anthony Goodman also told the DEA that Jackson and his partners were selling drugs to someone in New York City. The DEA focused its investigation on a New York drug dealer named Mahlon Steward. Telephone records linked Garcia to Jackson and Steward. Although Steward denied knowing Garcia, Steward's address book listed Garcia's initials and pager number. Steward's girlfriend, Stephanie Frye, told the DEA that she had met Garcia and knew he was trafficking drugs with Steward. She also testified that Jackson started sending drugs to Steward in 1983. Reed testified that Steward would often send packages of cash to Los Angeles and that one such package was sent to Garcia.
 
 
 8
 Soon after each of the three thefts of drugs, Jackson and Garcia (along with a third DEA agent, Wayne Countryman) made large deposits in Swiss banks with cashier's checks, often structured to evade reporting requirements. Garcia had opened a Swiss bank account in November 1983 with a deposit of twelve separate cashier's checks, all under $10,000, for a total of $100,000. After the October 1984 heroin theft, Garcia deposited $62,010 from November 1984 to January 1985. After the January 1985 theft of three pounds of heroin, Garcia deposited $70,000 in March and April 1985. After the theft of 150 kilograms of cocaine, Garcia made deposits of nearly $800,000 in March of 1986.
 
 
 9
 Travel agency records showed that Garcia, Jackson, and Countryman traveled extensively in Europe, including Switzerland. In March 1986, the three went to Zurich and deposited about $2 million. When Garcia traveled, he bought his tickets with cash and flew first class. In 1984, Garcia went to Germany and told a DEA colleague that he wanted to buy a Maserati or Lamborghini. Although Garcia claimed that his extra income derived from working in the jewelry business and smuggling gold for jewelry dealers, Reed testified that he earned at most $150,000 from such activities.
 
 
 10
 On May 18, 1987, Garcia transferred $420,000 from his Swiss bank account to a checking account in Santa Monica. Ten days later, he withdrew $556,000 from the Santa Monica account to pay for the defendant real property in Rancho Palos Verdes. Garcia had contracted to build the house in January 1986. The purchase price was $581,000. The $161,000 not traceable to the Swiss bank accounts derived from the sale of other properties and a CD purchased from the Santa Monica Bank, all of which were bought or improved with large amounts of unexplained cash. About eight months after they bought the house, the Garcias obtained a mortgage from Home Savings & Loan in the amount of $350,000, most of which was deposited into a bank account in Luxembourg.
 
 
 11
 After the government seized the house in June 1989, Adaline Garcia continued to live there until November 1989. On January 2, 1990, the government and claimants entered a stipulation to sell the house for no less than $1.1 million, pay off the mortgage owed to Home Savings of America, and deposit the net sales proceeds in an interest-bearing account, which would become the substitute res. The house was sold on April 22, 1991, for $1,070,000, and after paying the mortgage costs, back taxes, and other expenses, the substitute res amounted to $556,594.38. The Garcias' lawyers, who had recorded liens against the real property in October 1990, agreed to release their liens to allow for the sale of the property, on the condition that "the priority . . . and any rights this lien may have in connection with the Property will be preserved as against the sales proceeds as if the Property had not been sold." In October 1991, the attorneys recorded state court judgments for fees owed by the Garcias.
 
 
 12
 The forfeiture action was stayed pending Darnell Garcia's criminal trial. Garcia was convicted on drug and money laundering charges in April 1991 and was eventually sentenced to 80 years in prison. United States v. Garcia, 37 F.3d 1359, 1362 (9th Cir. 1994). The district court then granted summary judgment for the government in the forfeiture action, finding that the criminal conviction established probable cause. The conviction covered the $420,000 wired from Swiss banks-which comprised 72 percent of the $581,000 purchase price--so the district court awarded the government 72 percent of the sales price of $1,070,000 for a total of $770,400. Because the substitute res only comprised $556,493.28, the government was awarded the entire amount. The government executed the judgment in September 1991, and this court granted a motion to dismiss the appeal for lack of jurisdiction, based on United States v. $84,740.00 U.S. Currency, 900 F.2d 1402, 1404 (9th Cir. 1990), which held that appellate jurisdiction was divested by the transfer of the res.
 
 
 13
 That holding was overruled in Republic National Bank of Miami v. United States, 506 U.S. 80, 89 (1992), and the Supreme Court granted certiorari and vacated and remanded the present case. On August 1, 1995, a three-judge panel then reversed summary judgment on the ground that the Double Jeopardy Clause prohibited a civil forfeiture action after a criminal conviction under United States v. $405,089.23 U.S. Currency, 33 F.3d 1210, 1218 (9th Cir. 1994). $405,089.23 U.S. Currency was then reversed by the Supreme Court in United States v. Ursery, 518 U.S. 267, 291 (1996). Despite that reversal, this court mistakenly issued a mandate in the present case in September 1996 but then recalled it and ordered further briefing in December. On July 16, 1997, this court again reversed the district court, holding that probable cause had to be established at the time of the filing of the forfeiture complaint and could not be based on the criminal conviction.
 
 
 14
 On remand, the claimants moved to quash the 1989 seizure warrant based on United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993), which required notice and hearing before prejudgment seizure of real property. On December 1, 1997, the district court quashed the warrant but refused to award damages. On December 30, 1997, the claimants moved to expunge the lis pendens on the house, at which point the government voluntarily withdrew it. On March 5, 1998, the attorneys directed the Los Angeles County Sheriff to levy on the substitute res, arguing that the quashing of the warrant and the withdrawal of lis pendens made their claims for unpaid fees senior to the government's and enforceable. On an ex parte application from the government, the district court entered an injunction on April 27, 1998, prohibiting the attorneys from attempting to enforce the state court judgments against the substitute res. The attorneys filed an interlocutory appeal of the injunction, which this court affirmed.
 
 
 15
 On the same day that the district court enjoined the enforcement of the state court judgments, the attorneys filed claims and answers, seeking to intervene as judgment-creditors in this case. On April 30, 1998, the government filed an ex parte motion to strike the claims and answers, and on the following day, the attorney-claimants filed an ex parte application to recuse Judge Real. The disqualification application was referred to Judge Stephen Wilson on May 13, 1998, who denied it the following day. On June 30, Judge Wilson issued a clarifying order reiterating the denial.
 
 
 16
 On June 2, 1998, Judge Real granted the motion to strike the attorneys' claims and answers. The probable cause hearing was held on August 12-13, 1998, and September 10-11, 1998. Prior to the hearing, the district court ruled on motions in limine, granting the government's motion to admit foreign bank records and denying the claimants' motion to exclude evidence that Adaline Garcia was not an innocent owner. At the hearing, Special Agent Reed testified, and Special Agent Fotinatos testified by declaration on direct and then was cross-examined in court. The claimants sought to call DEA and IRS supervisors to testify about Darnell Garcia's alleged gold smuggling activities, but Judge Real required the claimants to obtain declarations from them. On the final day of the hearing, the claimants submitted three documents that "obviated the need for calling the witnesses" but still sought to cross-examine the government agents. When counsel for the claimants said that the agents were not present to testify, Judge Real said, "This case has been just floating along, floating along, some by reason of my calendar, but a lot by reason of counsel. No I'm not going to stand for that."
 
 
 17
 On October 23, 1998, the district court found probable cause for forfeiture. In August 1999, the trial was held on the issue of innocent ownership, but the claimants did not present any evidence on the issue. In September 1999, the claimants filed a motion for judgment in favor of the plaintiffs on the ground that the forfeiture was an unconstitutionally excessive fine. The district court entered judgment of forfeiture on October 8, 1999, and the claimants timely appealed.
 
 STANDARD OF REVIEW
 
 18
 This court reviews de novo the district court's legal conclusion as to whether damages are available. See EEOC v. WalMart Stores, Inc., 156 F.3d 989, 992 (9th Cir. 1998). Dismissal of an untimely claim in a forfeiture action is reviewed for abuse of discretion. See United States v. 1982 Yukon Delta Houseboat, 774 F.2d 1432, 1435-37 (9th Cir. 1985). Evidentiary rulings are reviewed for abuse of discretion. See United States v. Fleming, 215 F.3d 930, 938 (9th Cir. 2000). The district court's probable cause determination is reviewed de novo. See United States v. $129,727.00 U.S. Currency, 129 F.3d 486, 489 (9th Cir. 1997). Application of collateral estoppel is reviewed de novo. Miller v. County of Santa Cruz, 39 F.3d 1030, 1032 (9th Cir. 1994). The constitutionality of a statute is reviewed de novo. United States v. 3814 N.W. Thurman Street, 164 F.3d 1191, 1195 (9th Cir. 1999).
 
 DISCUSSION
 
 19
 I. CLAIMANTS ARE NOT ENTITLED TO DAMAGES FOR THE UNCONSTITUTIONAL SEIZURE OF THE REAL PROPERTY BEFORE THE JUDGMENT OF FORFEITURE
 
 
 20
 The claimants first argue that the district court erred by denying the Garcias damages equal to lost rent from the date the property was seized (June 16, 1989) to the date it was sold (April 22, 1991) as well as interest on the sale proceeds from the date of sale to the entry of judgment (October 8, 1999). The prejudgment seizure of the Garcias' house under 21 U.S.C. §§ 881(a)(7) violated the Due Process Clause, which "requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993) (hereinafter"Good"). See also United States v. Real Property Located at 20832 Big Rock Drive, 51 F.3d 1402, 1405-06 (9th Cir. 1995) (hereinafter "Big Rock") (applying Good retroactively to cases pending at the time of that decision).
 
 
 21
 In Good, the Supreme Court characterized the prejudgment seizure of real property as a deprivation that"gives the Government not only the right to prohibit sale, but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property." Good, 510 U.S. at 54. This court has looked to the language of Good in the attempt to devise a remedy for illegal seizure that would make a claimant whole. In Big Rock, for example, we held that the proper remedy for an illegal seizure of property is the suppression of evidence obtained as a result of the seizure and the payment of any rents accrued during the illegal seizure. Big Rock, 51 F.3d at 1406 (citation omitted). The holding in Big Rock was extended in United States v. Real Property Located in El Dorado County at 6380 Little Canyon Road, 59 F.3d 974 (9th Cir. 1995) (hereinafter "El Dorado"), abrogation on other grounds recognized by United States v. $273,969.04 U.S. Currency, 164 F.3d 462, 466 n.3 (9th Cir. 1999). In El Dorado we held that"an award of rents may not be the sole relief available to [the claimant] . . . . [T]he district court should make a determination of the appropriate monetary or other relief, if any, for loss of use and enjoyment to which [the claimant] is entitled for the illegal seizure of his property." El Dorado, 59 F.3d at 981. At least one district court has expressly included in that determination interest on the proceeds of the sale of seized real property. See United States v. Real Property Located at Incline Village, 976 F. Supp. 1327, 1349-50 (D. Nev. 1997) ("Until the date the court enters final judgment, both the rents generated by the defendant properties and the interest earned on the proceeds from the sales of the defendant properties belong to[the claimant].").
 
 
 22
 The Garcias' house was never rented to anyone; any remedy involving accrued rents would therefore be purely speculative. In September 1991, though, the substitute res of $567,853.05 started earning interest. By September 1999, when the district court lodged its findings of fact and conclusions of law, $222,363.33 in interest had accrued. Even if the disgorgement of interest is the proper remedy for the illegal prejudgment seizure, however, as a matter of equity the Garcias are not entitled to damages. In its findings of fact and conclusions of law, the district court found that the Garcias improperly obtained a $350,000 mortgage after purchasing the defendant real property "in an attempt to divert a significant portion of their assets overseas." The district court included this sum plus interest (a total of $412,353.29) in its calculation of net sales proceeds. These findings were not challenged on appeal. Any interest owed the Garcias is offset by the amount of money depleted from the res. Because this amount--whether $350,000 or $412,353.29--is greater than the interest earned on the substitute res, the Garcias are not entitled to damages.
 
 
 23
 II. THE DISTRICT COURT PROPERLY DISMISSED ATTORNEY APPELLANTS' CLAIMS
 
 
 24
 On April 27, 1998, about a week before the trial date scheduled for May 5, the attorney-claimants filed claims on the proceeds of the defendant real property and answers to the forfeiture complaint pursuant to Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims. The answers alleged that the attorneys' rights to the proceeds became senior to the government's rights when the government voluntarily withdrew its lis pendens. The government filed an ex parte application to strike the claims and answers as untimely, which the district court granted. The claimants argue on appeal that the district court erred. This argument has no merit.
 
 A. The Attorneys' Claims Were Untimely
 
 25
 Supplemental Rule C(6) provides a 10-day deadline for filing property claims after process has been executed. The claimants argue that they filed their claims and answers the first day possible after the district court enjoined enforcement of a state court writ of execution. But that was not the first day the attorneys could have filed their claims. Rather, this forfeiture action has been pending since 1989, and the attorneys' claims were perfected in October 1991. At that time, the claimants had notice of this action and could have intervened as judgment creditors. Their reason for not doing so is essentially that the government's interest was then senior to theirs. Just because their claims were not obviously winning ones does not excuse their failure to file in a timely fashion. The conduct of the attorneys seems to undermine their argument that filing claims would have been futile; while the attorneys' claims seemed to be junior to the government's, they actively attacked the government's seniority. Cal. Civ. Proc. Code §§ 405.61 provides that withdrawal of lis pendens relieves of actual knowledge all non-parties to an action at the time of recording of the notice of withdrawal. See Knapp Development & Design v. Pal-Mal Properties, Ltd., 240 Cal. Rptr. 920, 923 (Ct. App. 1987) ("Recordation of an expungement order expressly eliminates binding knowledge of the pendency of an action to any person other than a party to the action who becomes a purchaser, transferee, mortgagee or other encumbrancer for value of any interest in subject real property prior to recordation of judgment in the action."). Had the attorneys filed their claims in a timely fashion, they would have been parties to the action, and their claims would not be superior to the government's. The logic of the attorneys' claim is therefore circular: They argue they did not have to follow Rule C(6)'s filing requirements until they had a plausible basis for seniority, but that basis (that the government's claim on the defendant real property lost seniority because of the withdrawal of lis pendens) is only plausible because they did not follow the filing requirements.
 
 B. Ex Parte Proceedings Were Appropriate
 
 26
 Claimants next argue that the district court erred by entertaining an ex parte motion to strike the claims and answers. Although ex parte proceedings are appropriate only in a narrow set of circumstances, see In re Intermagnetics Am., Inc., 101 B.R. 191, 193-94 (C.D. Cal. 1989), the unusual facts of the present case justify their use. The attorney-claimants had filed untimely claims and answers and an ex parte motion for a continuance a week before trial was scheduled. This meritless action could have significantly delayed a case that was nearing resolution after nine years.
 
 
 27
 C. The Motion for Disqualification Was Resolved by the Time the District Court Ruled on the Motion to Strike Attorneys' Claims
 
 
 28
 Finally, the claimants argue that the trial judge violated district court rules by dismissing their claims while a motion to disqualify him was pending. Judge Real granted the motion to strike the attorneys' claims on June 3, 1998. The disqualification motion was referred to District Judge Stephen V. Wilson on May 13, 1998, and according to the appellants, Judge Wilson did not rule on the disqualification issue until June 30, 1998. In fact, the June 30 order from Judge Wilson merely clarified an order entered on May 14, 1998, denying the ex parte application for an order recusing Judge Real from further proceedings. Although Judge Wilson's first ruling on the disqualification motion referred to only one of the two code sections under which the motion was brought and omitted one of the attorney claimants, the May 14 order denied"claimants' ex parte application for order recusing trial judge from further proceedings." This order was unequivocal; the conclusions reached in it covered all claimants and all bases for the motion. It is little surprise that the clarifying order of June 30 characterizes the omissions of the prior order as"inadvertent[ ]." We therefore hold that Judge Real did not dismiss the attorneys' claims until after the disqualification motion had been denied.
 
 
 29
 III. THE DISTRICT COURT PROPERLY ADMITTED SWISS BANK RECORDS
 
 
 30
 At the probable cause hearing, the government introduced into evidence Swiss bank records showing that Darnell Garcia deposited millions of dollars in cash in Swiss bank accounts during the period he was allegedly selling drugs and that in order to purchase the defendant real property, he transferred $420,000 from the Swiss Bank Corporation to his checking account at Santa Monica Bank. The claimants argue that the records are inadmissible in the forfeiture hearings because (1) use of the records violated the terms of the Mutual Legal Assistance Treaty between Switzerland and the United States ("Treaty") and (2) the government promised during a previous oral argument not to use the records. Neither argument has merit.
 
 
 31
 First, the United States obtained the Swiss bank records pursuant to the Treaty for its criminal prosecution of Darnell Garcia. Article 5 of the Treaty provides that such records "shall not be . . . introduced into evidence . . . in any proceeding relating to an offense other than the offense for which assistance has been granted." Art. 5 ¶¶ 1. But the Treaty contains an important exception: "Nothing in this Treaty shall be deemed to prohibit governmental authorities in the requesting state from: (a) using the materials . . . in any investigation or proceeding concerning the civil damages connected with an investigation or proceeding for which assistance has been granted." Art. 5 ¶¶ 3. This exception covers the use of the Swiss records in the present case.
 
 
 32
 Even if the exception to the Treaty's limiting provisions does not apply, the civil forfeiture action and criminal prosecution derive from the same criminal conduct. The claimants mistakenly rely on United States v. Ursery, 518 U.S. 267, 273 n.1 (1996), for the argument that the Treaty's limitation applies in the present case. Regardless of whether the civil and criminal actions involve the same offense for Double Jeopardy purposes (an issue left undecided in Ursery), Garcia's offenses of conviction form the predicate for forfeiture under 21 U.S.C. §§ 881(a)(7). Civil forfeiture is a "proceeding relating to . . . that offense for which assistance has been granted," art. 5 ¶¶ 1, so the Treaty in no way blocks the district court's discretion to admit the Swiss bank records.
 
 
 33
 Second, the claimants argue that the government is estopped from using the Swiss bank records because a federal prosecutor said during a 1993 oral argument that this evidence would not be introduced in the probable cause hearing. The claimants misstate what the government said to this court. Throughout these proceedings, the government has made two representations: that it would not introduce the records in the forfeiture action if using them would violate the Treaty and that it did not have to use the records to establish probable cause for forfeiture. Neither representation amounts to a promise not to use the records. The government correctly determined that using the records did not violate the Treaty, and regardless of the government's assessment of the strength of its case, it reserved the right to introduce the records into evidence. The district court did not abuse its discretion in admitting the Swiss bank records.
 
 
 34
 IV. THE GOVERNMENT ESTABLISHED PROBABLE CAUSE FOR THE FORFEITURE
 
 
 35
 The claimants next challenge the district court's finding of probable cause for forfeiture. "The determination of probable cause is based on the aggregate of facts and simply involves the question of whether the information relied on by the government is adequate and sufficiently reliable to warrant the belief by a reasonable person that the money was connected to drugs. Circumstantial evidence may suffice to establish probable cause for forfeiture." United States v. $30,060.00 U.S. Currency, 39 F.3d 1039, 1041 (9th Cir. 1994) (citations and quotation marks omitted). "[T]he government must show that it had reasonable grounds to believe that the money was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion. To pass the point of mere suspicion and reach probable cause, it is necessary to demonstrate by some credible evidence the probability that the money was in fact connected to drugs." Id.
 
 
 36
 Taken as a whole, the evidence easily meets the threshold for probable cause. Numerous witnesses describe drug deals involving DEA Agent John Jackson, and numerous witnesses describe Jackson's close relationship with Garcia. Garcia's initials and pager number were in the address book of drug dealer Mahlon Steward, and telephone records link Garcia to Steward. Steward's girlfriend identified Garcia as one of Steward's drug trafficking partners. The evidence also establishes that Garcia made numerous suspicious cash deposits in Swiss bank accounts after drug thefts and that money from a Swiss account was used to pay 72 percent of the purchase price of the defendant real estate.
 
 
 37
 The claimants argue that the government's evidence is uncorroborated double or triple hearsay, but probable cause may be established by hearsay and circumstantial evidence. United States v. $405,089.23 in U.S. Currency, 122 F.3d 1285, 1289 (9th Cir. 1997). The claimants' attempts to impeach the credibility of various pieces of testimony are unconvincing, and much of the evidence is either corroborated or conclusively established by telephone, travel, and bank records.
 
 
 38
 The claimants also argue that evidence that Garcia smuggled gold undermines the finding of probable cause. This argument fails not only because a finding of probable cause does not require a conclusive determination that drugs are the only possible source of proceeds, but also because the argument is based almost entirely on the fact that the gold dealers who testified that they paid Garcia at most $150,000 were not reliable witnesses. But there is no evidence that Garcia actually made more than that sum.
 
 
 39
 Finally, the claimants argue that the government did not establish probable cause as to $161,000 of the purchase price of the defendant real estate. This sum derived from the sale of the Garcias' old house and a rental property. The facts show that the Garcias were building equity and improving those properties with suspicious cash payments at roughly the same time that Garcia was making large amounts of money from drug trafficking. The aggregate of facts more than supports the district court's probable cause determination. Even if the district court's determination were erroneous, the government would still be awarded the entire substitute res. Because there is probable cause for forfeiture of $420,000 of the $581,000 purchase price--72 percent--the government would be entitled to at least 72 percent of the resale price of $1,070,000. That sum, $770,400, is greater than the amount of the substitute res.
 
 
 40
 V. THE TRIAL COURT DID NOT IMPROPERLY RESTRICT WITNESS PRESENTATION
 
 
 41
 Claimants next argue that they should have been able to cross-examine two investigators who focused on Garcia's employment by a jewelry business. Any error in the district court's conduct would be harmless, however, because crossexamination only would have established the unreliability of testimony that Garcia was paid no more than $150,000 for gold smuggling activities. Their testimony would not have established that Garcia actually made more money. Even if the cross-examination would have suggested the possibility of an alternative source of the cash used to buy the defendant real property, the existence of an alternative hypothesis does not defeat a finding of probable cause.
 
 
 42
 VI. THE DISTRICT COURT PROPERLY ALLOWED EVIDENCE THAT ADALINE GARCIA WAS NOT AN INNOCENT SPOUSE
 
 
 43
 On November 24, 1992, the United States Tax Court entered a stipulation between the I.R.S. and Adaline and Darnell Garcia that found that Darnell Garcia had an income tax deficiency of $367,275 for the year 1985, but that there was no joint liability. The claimants now argue that this stipulation --which they say assumes that Adaline Garcia was an innocent spouse--should have collaterally or judicially estopped the government from introducing evidence to the contrary during the present forfeiture proceedings.
 
 
 44
 Collateral estoppel is appropriate when "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." In re Palmer, 207 F.3d 566, 568 (9th Cir. 2000). A stipulation may meet the "fully litigated" requirement where "it is clear that the parties intended the stipulation of settlement and judgment entered thereon to adjudicate once and for all the issues raised in that action." Green v. AncoraCitronelle Corp., 577 F.2d 1380, 1383 (9th Cir. 1978).
 
 
 45
 The present case is entirely different from Green, which involved a federal suit that sought to relitigate a state court action that had been settled by the same parties. Collateral estoppel is inappropriate in the present case for two reasons. First, there is no evidence that the parties intended the stipulation to be a final adjudication of the merits of the innocent spouse issue. The fact that Darnell Garcia agreed to pay a substantial percentage of the money sought by the I.R.S. suggests that the finding of no joint liability was hardly a significant concession. Second, the tax deficiency case only covered the year 1985, and the forfeiture case covered a period of six years. The tax case did not approach a full litigation of the innocent spouse issues.
 
 
 46
 Judicial estoppel is also not warranted because the positions taken by the I.R.S. and the U.S. Attorney are not inconsistent and do not undermine the integrity of the court. See New Hampshire v. Maine, 121 S. Ct. 1808, 1814-15 (2001).
 
 
 47
 VII. FORFEITURE PROCEDURES DO NOT VIOLATE DUE PROCESS
 
 
 48
 The claimants argue that forfeiture procedures violate due process by shifting the burden of proof to the claimant upon a mere showing of probable cause. This argument was rejected in United States v. $129,727.00 U.S. Currency, 129 F.3d 486, 491-94 (9th Cir. 1997).
 
 VIII. THE FORFEITURE IS NOT AN EXCESSIVE FINE
 
 49
 The government brought its forfeiture complaint under 21 U.S.C. §§ 881(a)(6), which makes subject to forfeiture "all proceeds traceable to [a drug transaction]." The claimants argue that the forfeiture of the defendant real estate constituted an excessive fine in violation of the Eighth Amendment.
 
 
 50
 Although forfeitures under 21 U.S.C. §§§§ 881(a)(4) and (a)(7) are considered punitive and within the ambit of the Eighth Amendment, see Austin v. United States , 509 U.S. 602, 622 (1993) ("[F]orfeiture under [those code paragraphs] constitutes payment to a sovereign as punishment for some offense and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause.") (citation and quotation marks omitted), forfeiture under paragraph (a)(6) is entirely different. Paragraphs (a)(4) and (a)(7) involve the forfeitures of conveyances and real property that facilitate drug transactions, and paragraph (a)(6) involves forfeiture of drug proceeds. Although this court has not ruled directly on this issue, it is the view of a number of courts of appeals that "[f]orfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity." United States v. Alexander, 32 F.3d 1231, 1236 (8th Cir. 1994). See also United States v. One Parcel of Real Property Described as Lot 41, Berryhill Farm Estates, 128 F.3d 1386, 1395 (10th Cir. 1997) ("[W]e . . . hold as a matter of law that forfeiture of drug proceeds pursuant to §§ 881(a)(6) can never be constitutionally excessive."); Smith v. United States, 76 F.3d 879, 882 (7th Cir. 1996) ("[P]roceeds forfeitures can never be out of proportion to the `loss' suffered by the government or society. If there has been a finding that certain property, for instance, is forfeitable pursuant to§§ 881(a)(6) as proceeds of drug trafficking, . . . [i]t directly represents at least a portion of the profits and can thus be less than or equal to society's loss, but not more than the loss.") (emphasis in original). Cf. United States v. $405,089.23 U.S. Currency, 122 F.3d 1285, 1292 (9th Cir. 1997) (Reinhardt, J., concurring in part and dissenting in part) (arguing that a remand was unnecessary for consideration of a challenge based on the excessive fines clause to a forfeiture under 21 U.S.C. §§ 881(a)(6) because "it appears to me that were we to reach the Eighth Amendment claim we would be required to reject it").
 
 
 51
 Because criminal proceeds represent the paradigmatic example of "guilty property," the forfeiture of which has been traditionally regarded as non-punitive, we follow the Seventh, Eighth, and Tenth Circuits and hold that the excessive fines clause of the Eighth Amendment does not apply to a forfeiture action brought under 21 U.S.C. §§ 881(a)(6).
 
 CONCLUSION
 
 52
 For the foregoing reasons, we AFFIRM.
 
 
 
 Notes:
 
 
 [1]
 We do not reach this issue because we are not ordering a remand.