**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.

MELISSA R. BEECROFT,
          *Defendant-Appellant.*

No. 12-10175

D.C. No.
2:08-cr-00064-
RLH-GWF-3

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Senior District Judge, Presiding

Argued and Submitted November 16, 2015
San Francisco, California

Filed June 13, 2016

Before: Diarmuid F. O'Scannlain and Milan D. Smith, Jr.,
Circuit Judges, and Brian M. Morris, District Judge.[*]

Opinion by Judge O'Scannlain

---

[*] The Honorable Brian M. Morris, District Judge for the U.S. District Court for the District of Montana, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed an order of restitution and the amounts of forfeiture on the defendant's convictions for Counts 10, 11, 13, and 14; vacated $107 million in forfeiture ordered on her conviction on Count 1; and remanded for reconsideration of the appropriate amount of such forfeiture, in a case in which the defendant was convicted for participating in an extensive mortgage-fraud conspiracy.

The panel held that the defendant's bare speculation that the process employed by the district court in calculating the losses incurred by the victim banks was somehow deficient does not approach her burden of demonstrating clear or obvious error in the district court's restitution calculations. Rejecting the defendant's Eighth Amendment challenge to the restitution order, the panel wrote that without error in the loss calculation, the defendant cannot show that requiring her to pay that amount back to the victims was somehow excessive or grossly disproportional to her crimes. The panel noted that the district court required the defendant to pay slightly more than $2 million of the more-than-$50 million in losses caused by the conspiracy in which she participated.

The panel held that the district court did not err in calculating the proceeds of her criminal activity when imposing the order of money forfeiture. The panel rejected the defendant's contention that the district court needed to

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

take additional evidence to determine the "accurate" amount of loan proceeds obtained by the conspiracy, where the defendant has not argued, let alone demonstrated, what "good reason" the court had to believe that the government's proposed forfeiture amount exceeded the proceeds of her crimes. The panel wrote that this court has previously rejected the argument that a defendant should not be ordered to forfeit the total loan proceeds, where the defendant never personally received the money but instead made only a small commission on each transaction.

The panel held that the order of forfeiture imposed against the defendant personally at sentencing is punitive and therefore subject to Eighth Amendment excessiveness review. The panel held that the amounts of forfeiture ordered on the defendant's four subsidiary counts of conviction ($330,000; $305,000; $325,000; and $460,000) are not excessive, given the gravity of the offenses, and that the amounts are substantially less than the $1 million maximum fine authorized by statute and the Sentencing Guidelines range. The panel held that the $107 million forfeiture order on the conspiracy count, which is 100 times greater than the maximum fine allowable and 5,000 times greater than the lower end of the Guidelines range, runs afoul of the Excessive Fines Clause. The panel remanded for the district court to reconsider that amount.

**COUNSEL**

Angela H. Dows (argued), Premier Legal Group, Las Vegas, Nevada, for Defendant-Appellant.

Peter S. Levitt (argued), Assistant United States Attorney; Daniel G. Bogden, United States Attorney; Elizabeth O. White, Appellate Chief; United States Attorney's Office, Las Vegas, Nevada, for Plaintiff-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

Following her convictions for participating in an extensive mortgage-fraud conspiracy, a defendant was ordered to pay more than $2 million in restitution and to forfeit more than $100 million. We must decide whether either amount was erroneously calculated or unconstitutionally excessive.

I

A

From roughly 2003 through 2008, Melissa Beecroft took part in a multi-million dollar residential mortgage-fraud scheme in the Las Vegas area. Led by Steven Grimm and Eve Mazzarella, the conspirators recruited and paid straw purchasers[1] to buy homes at substantially inflated prices,

---

[1] Straw purchasers buy homes on behalf of other, undisclosed individuals, with no intention to keep the properties themselves.

sometimes with 100% mortgage financing. Once the mortgage loans were funded, Grimm and Mazzarella caused title and escrow companies to disburse excess funds to various shell corporations they owned, under the pretense of using the money to make repairs and improvements to the homes, though such repairs were never made. Grimm and Mazzarella also arranged to have participating mortgage brokers and loan officers remit a portion of their commissions and fees to Grimm. After each sale, the straw buyers would then transfer ownership in the properties themselves to Grimm and Mazzarella's shell corporations.

Altogether, the scheme involved more than 400 straw-buyer transactions and 227 properties purchased for more than $100 million. The vast majority of the loans involved went into default, causing the lenders to lose tens of millions of dollars.

B

Beecroft's role in the scheme began sometime after September 2002, when she was hired as an administrative assistant at Grimm's company, Desert Funding. In April 2003, Beecroft began working as an independent loan processor for Select Equities, another company Grimm owned, and she later became the owner and manager of a third company, Secured Mortgage Services, in which the majority of her business consisted of mortgages she prepared for Grimm. In these positions, Beecroft participated extensively in Grimm's mortgage-fraud scheme, completing loans for Grimm, handling false information that was given to banks on behalf of straw buyers (including inflating income information and even completing some of the fraudulent loan applications herself), and directing to whom

fraudulent third-party disbursements would be made. Beecroft participated in the scheme for years—joining Grimm even before Mazzarella did—and was described by at least one witness as Grimm's "right hand."  According to the government, Beecroft's participation caused 143 of the 227 properties to go into default.  The government believes she made in excess of $400,000 from commissions and fees generated during the scheme.

C

For her role in the scheme, Beecroft was charged with conspiracy to commit bank, mail, and wire fraud, in violation of 18 U.S.C. § 1349, along with multiple subsidiary counts of both mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.  After a lengthy jury trial, Beecroft was convicted of the conspiracy count (Count 1), along with four subsidiary counts—two counts each of mail and wire fraud (Counts 10, 11, 13, and 14).

Prior to sentencing, the probation office filed a presentence investigation report (PSR) calculating Beecroft's offense level at 37.[2]  The Guidelines range for imprisonment was 210 to 262 months per count, and the PSR recommended 210 months for each count (to run concurrently).  The PSR also recommended that Beecroft be ordered to pay full restitution to the victims for the losses caused by the conspiracy, calculated at more than $52 million in total, as supported in exhibits provided by the government.  The Guidelines authorized a fine between $20,000 and $1 million

---

[2] Originally, the PSR calculated Beecroft's offense level at 39, but an amended PSR later removed a 2-level enhancement for personally receiving $1 million.

per count, but the PSR recommended no fine, given the large amount of restitution recommended.

At sentencing, the district court concluded that, although Beecroft was in some sense "the hub" of the scheme, she was "not anywhere near as culpable as Mr. Grimm or Miss Mazzarella," and did not orchestrate the conspiracy or perhaps even fully understand it. Accordingly, the court sentenced Beecroft significantly below the Guidelines range and the PSR's recommendation: only three years in prison and five years under supervised release. Regarding restitution, the court again bristled at ordering the full amount recommended in the PSR. Instead, the court limited the loss calculation to certain properties proven at trial—a total of $2,275,025—rather than the more than $52 million for all properties involved in the conspiracy. The district court also entered a criminal monetary forfeiture order against Beecroft in the sum of $107 million for the conspiracy count, and forfeiture of an additional $1,420,000 for the remaining four counts. Beecroft's counsel stated that he had no objection to the sentence, including the orders of restitution and criminal forfeiture.

II

Beecroft timely appealed and now argues that the amounts of restitution and forfeiture ordered against her were not properly calculated and otherwise violated the Eighth Amendment. Because Beecroft did not raise these objections to the district court, we review Beecroft's claims only for plain error. *See United States v. Kuo*, 620 F.3d 1158, 1162 (9th Cir. 2010) (reviewing method of calculating restitution for plain error); *United States v. Kearns*, 61 F.3d 1422, 1428 (9th Cir. 1995) (reviewing constitutionality of forfeiture order

for plain error). Under such review, we "may, in [our] discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights . . . ; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014) (internal quotation marks omitted).

## III

We first consider Beecroft's challenges to her $2,275,025 order of restitution. Beecroft contends that such amount was not supported by adequate evidence and that it violated the Eighth Amendment. We address each argument in turn.

## A

Under the Mandatory Victims Restitution Act (MVRA), "a court must order a defendant to make restitution to a victim of certain specified offenses." *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (internal quotation marks omitted); *see generally* 18 U.S.C. § 3663A. Because the goal of restitution is to make the victim whole, "any award is limited to the victim's actual losses." *Anderson*, 741 F.3d at 951 (internal quotation marks omitted). The victims of the fraudulent scheme in which Beecroft participated were the banks from which loans were wrongfully obtained. Their losses are calculated as the total amount of unpaid principal still owed on the relevant loans, less whatever money the banks recovered from sale of the collateral properties themselves. *See Robers v. United States*, 134 S. Ct. 1854, 1856 (2014).

Beecroft agrees, but she contends that the record does not contain adequate evidence to demonstrate that the court indeed determined the amount of her restitution through such method. Specifically, Beecroft suggests that the court did not receive evidence that would have allowed it to account for the value of the collateral properties when calculating the banks' losses, and asks that the case be remanded to ensure that the district court does so.

But, aside from her own skepticism, Beecroft gives no reason to doubt that the district court did exactly what she now requests. Indeed, the district court explicitly stated that it would calculate loss through the method Beecroft advocates: "[T]his court is of the opinion that except where it is impossible to do so, the correct loss calculation is the amount of the loan, less whatever was recovered in the sale, including the foreclosure sale, or the value at sentencing, if there has been no sale."

Beecroft rightly notes that it was the government's burden to provide reliable evidence to support loss calculation, *Anderson*, 741 F.3d at 951–52, and the government did precisely that. It, too, argued for the method of calculation that Beecroft now advocates, and it provided the district court with exhibits detailing the difference between the properties' loan amounts and the value recovered through foreclosure sales, as reported in public records. Those exhibits calculated the banks' total losses to be more than $50 million, an amount the probation office agreed with in its PSR. In her sentencing memorandum, Beecroft did not question the accuracy of these figures or suggest that the government failed to offset the value of the collateral properties, but instead she argued that restitution should be based on her personal gain rather than

the victims' losses.[3]  Now on appeal, Beecroft *still* does not argue, let alone demonstrate, that the figures presented by the government were unreliable, and she fails even to allude to other figures that might reflect a more accurate calculation.

Morever, although the district court acknowledged the government's and PSR's calculations—and did not question their accuracy—it ultimately elected to impose a substantially lower restitution amount, to account only for the $2,275,025 in losses attached to certain properties which were alleged and proven at trial.  Beecroft not only failed to object to this amount at sentencing, but indeed her sentencing memorandum *asked* the court to set restitution in an amount similar to this lower figure.

Beecroft's bare speculation on appeal that this process was somehow deficient does not approach her burden of demonstrating clear or obvious error in the court's restitution calculations.[4]

B

Even though the loss amount was properly calculated, Beecroft argues that the order of restitution nevertheless violates the Eighth Amendment.  Beecroft suggests that the

---

[3] Beecroft no longer presses this argument—which is clearly out of step with controlling law—on appeal.

[4] To the extent Beecroft argues that the court erred by failing to consider other factors set forth in 18 U.S.C. § 3664(f)(2)—such as her financial resources—before setting the restitution amount, such argument also fails. The factors Beecroft references are to be considered only *after* the amount of restitution has already been determined, when crafting the defendant's payment schedule.

amount of restitution was unconstitutionally excessive, because it is "grossly disproportionate" to the gravity of her offenses.

We have previously recognized that "proportionality is inherent in a MVRA restitution order." *United States v. Dubose*, 146 F.3d 1141, 1145 (9th Cir. 1998). Indeed, because restitution under the MVRA is "inherently linked to the culpability of the offender, restitution orders that require full compensation in the amount of the loss are not excessive." *Id.* at 1146. For this same reason, we cautioned that it "would be difficult to find any mandatory restitution imposed under the MVRA cruel and unusual," as well. *Id.* at 1147.

As noted, Beecroft has not demonstrated error in the district court's calculation of the amount of losses suffered by the banks injured by Beecroft's actions. Without error in the loss calculation, Beecroft cannot show that requiring her to pay that amount back to the victims was somehow excessive or grossly disproportional to her crimes, which caused the loss in the first place. And we reiterate that Beecroft was not ordered to pay anything approaching the full amount of the banks' losses. Uncontroverted evidence was presented to the district court showing that the scheme in which Beecroft participated caused losses in excess of $50 million; requiring her to pay slightly more than $2 million of that back is not an unconstitutional and excessive punishment.[5]

---

[5] Beecroft's contention that she will never be able to pay the full amount of her restitution is likewise unavailing. *See Dubose*, 146 F.3d at 1146 ("[A]n Eighth Amendment gross disproportionality analysis does not require an inquiry into the hardship the sanction may work on the offender.").

IV

We next consider Beecroft's challenges to the order of monetary forfeiture imposed at sentencing. Again, she argues that the amount of such order was both improperly calculated and unconstitutionally excessive.

A

A person convicted of Beecroft's crimes must be ordered to "forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" the crime. 18 U.S.C. § 982(a)(2). Unlike restitution, such forfeiture is ordered not to restore the victim, but instead to pay back the proceeds of the defendant's criminal activity. *See United States v. Newman*, 659 F.3d 1235, 1241–43 (9th Cir. 2011). For these purposes, "the 'proceeds' of a fraudulently obtained loan equal the amount of the loan." *Id.* at 1244. And where the defendant entered into a conspiracy, "the 'proceeds' of his crime equal the total amount of the loans obtained by the conspiracy as a whole." *Id.* Curiously, "forfeiture" may extend to property no longer in existence and sometimes even to property the defendant never actually possessed, a counter-intuitive interpretation compelled by prior precedent. *See id.* at 1241–45.

In line with this formulation, the district court ordered Beecroft to forfeit the total amount of money obtained from the fraudulent loans: $107 million for the conspiracy count, and a total of $1,420,000 for the four subsidiary counts.

1

Beecroft first argues that the district court's proceeds calculation—based on information presented by the government and the calculations presented in the PSR—was somehow insufficient. She contends that the court needed to take additional evidence to determine the "accurate" amount of loan proceeds obtained by the conspiracy.

The court had no such obligation. Where a court "*has good reason* to believe that the proposed forfeiture order exceeds the amount authorized by statute (here, 'proceeds'), then the court, *in its discretion*, may inquire into the factual basis for the proceeds." *Newman*, 659 F.3d at 1245 (emphasis added). Beecroft has not argued, let alone demonstrated, what "good reason" the court had to believe that the government's proposed forfeiture amount exceeded the proceeds of her crimes. Beecroft does not even argue that the figures adopted by the district court were indeed wrong, nor does she suggest other evidence that might show a different loan total. And, despite being given the opportunity at sentencing, Beecroft did not seek to present any such evidence before the district court, and she failed to indicate in any way that she believed the forfeiture amount to be inaccurate.

Once again, Beecroft's bare assertion that the district court needed more evidence to make an accurate accounting of the loan proceeds falls far short of her burden of demonstrating clear or obvious error in the court's calculation.

2

Beecroft also argues that she should not be ordered to forfeit the total loan proceeds, because she never personally received that money, but instead made only a small commission on each transaction. We previously rejected such an argument in *United States v. Newman*. There, we held that an individual participant in a mortgage-fraud conspiracy may be ordered to forfeit the total loan proceeds obtained by the conspiracy as a whole, notwithstanding the sum of money the individual himself received. We explained that "[i]t does not matter that [the defendant] personally profited very little," because he "entered into a conspiracy, [and] the 'proceeds' of [such] crime equal the total amount of the loans obtained by the conspiracy as a whole." *Newman*, 659 F.3d at 1244. So too here. Beecroft was convicted of participating in a conspiracy that earned over $107 million; the law requires her to forfeit the full proceeds of that crime, not simply what portion of those proceeds she may personally have received. *See id.*; *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005); *see also United States v. Quassani*, 593 F. App'x 627, 629 (9th Cir. Feb. 4, 2015) (mem.) (rejecting argument that the government must link forfeiture to individual defendant's share of mortgage-fraud proceeds); *United States v. Bilyeu*, 473 F. App'x 753, 754 (9th Cir. May 30, 2012) (mem.) (upholding order requiring individual participant in mortgage-fraud scheme to forfeit full proceeds of conspiracy).[6]

---

[6] Although it may seem unusual to order a defendant to "forfeit" money she may never have personally received, in the context of a conspiracy, our inquiry looks to what the conspiratorial *enterprise*—not the individual—gained. A conspiracy is "a partnership in crime"—an "enterprise" or a "confederation" in which "the partners act for each other

Beecroft suggests that *Newman*'s holding is somehow undermined by a later concurring opinion which raised the question whether a money launderer "who essentially is paid a commission on other people's money he handles as part of an illegal scheme can be made to 'forfeit' funds that passed through his hands but, it appears, were never his." *United States v. Davis*, 706 F.3d 1081, 1085 (9th Cir. 2013) (Berzon, J., concurring). Aside from carrying no precedential value—let alone any ability to overrule the standard set forth in *Newman*—such concurring opinion offers little support to Beecroft's argument in this case. In *Davis*, the defendant laundered money (for a fee) which undercover FBI agents presented to him as having been stolen. *Id.* at 1082. Critically, the defendant was not involved in the conduct that originally *acquired* that money. Nevertheless, the defendant was required to forfeit nearly the full sum of money that he laundered for the agents. *Id.* at 1082–83. The defendant appealed, arguing that this forfeiture amount should have been offset by an additional order of restitution against him—an argument the court rejected. *Id.* at 1084. Judge Berzon concurred, and raised a question the defendant himself had not asked: whether it was fair in the first place to characterize the money the defendant laundered for others as the "proceeds" of his illegal laundering operation. *Id.* at 1085 (Berzon, J., concurring). In that case, Judge Berzon's skepticism makes sense; while the proceeds of the defendant's illegal laundering operation clearly include the

---

in carrying it forward." *Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946). "Accordingly, the law treats a conspiracy, at least in some ways, as an entity distinct from its individual members." *Ocasio v. United States*, 136 S. Ct. 1423, 1441 (2016) (Sotomayor, J., dissenting). Thus, much like in a lawful partnership, "the proceeds of a conspiracy are a debt owed by each of the conspirators," regardless of the portion of those proceeds that each member received. *Spano*, 421 F.3d at 603.

fee he was paid *to perform the laundering*, it is quite another thing to suggest that the "proceeds" of that laundering also include the very money that he was asked to launder.

By contrast, regardless of her personal profit, Beecroft was integral to a conspiracy that fraudulently *acquired* over $107 million. It is not anomalous to order her jointly and severally liable, along with the other participants in that conspiracy, for the total amount of money that was illegally gained by the conspiratorial enterprise.[7] The district court did not err in doing so.

## B

Finally, Beecroft argues that the order of forfeiture imposed against her violates the Eighth Amendment's prohibition against "excessive fines." U.S. Const. amend. VIII.

## 1

First, we agree with Beecroft that the order of forfeiture in this case is subject to Eighth Amendment excessiveness review. A monetary forfeiture order is constrained by the Excessive Fines Clause only when it is imposed as "punishment" for some offense. *See United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998). We have previously explained that a general hallmark of criminal

---

[7] We recognize that some circuits limit forfeiture in these circumstances to "only so much of the proceeds (not received by [the defendant]) of the fraud as were *foreseeable* to him." *Spano*, 421 F.3d at 603 (emphasis added) (collecting cases). We do not consider whether to adopt such a foreseeability limit as well, because Beecroft has not argued for one.

forfeiture orders—distinguishing them from orders of restitution—is that they indeed serve to punish the defendant. *See Davis*, 706 F.3d at 1083–84; *Newman*, 659 F.3d at 1241.

The government correctly notes that there is some tension in our cases regarding when an *in rem* forfeiture of criminal proceeds is punitive.[8]  But we need not resolve that tension here, because Beecroft's forfeiture order was imposed against her personally "upon conviction" for her crimes. *See Kaley v. United States*, 134 S. Ct. 1090, 1094 (2014).  Such *in personam* forfeitures of criminal proceeds serve, at least in part, to punish; they "help to ensure that crime does not pay," by "punish[ing] wrongdoing, deter[ring] future illegality, and lessen[ing] the economic power of criminal enterprises." *Id.* (internal quotation marks omitted).  This has long been the case.  "[*In personam* criminal] forfeitures have historically been treated as punitive, being part of the punishment

---

[8] In *United States v. 3814 NW Thurman Street*, 164 F.3d 1191 (9th Cir. 1999), we held that a civil *in rem* forfeiture of the proceeds of a fraudulently obtained loan indeed constituted punishment, subjecting it to excessive-fines constraints. *See id.* at 1194, 1197–98.  In so concluding, the majority rejected an argument raised in dissent that "forfeiture of [criminal] proceeds can basically never be excessive," as it simply makes the defendant give up his illegal gains. *Id.* at 1199 (Rymer, J., dissenting).

Little over two years later, however, we held in a different case that a civil *in rem* forfeiture of the proceeds of an illegal drug transaction was *not* subject to an excessiveness review. *United States v. Real Property Located at 22 Santa Barbara Drive*, 264 F.3d 860, 874–75 (9th Cir. 2001).  There, we wrote broadly that, because "criminal proceeds represent the paradigmatic example of 'guilty property,' the forfeiture of which has been traditionally regarded as non-punitive, we . . . hold that the excessive fines clause of the Eighth Amendment does not apply to a forfeiture action brought under" the relevant statute. *Id.*  That opinion made no effort to distinguish the prior decision in *Thurman Street*.

imposed for felonies and treason in the Middle Ages and at common law." *Bajakajian*, 524 U.S. at 332; *see also id.* at 332 & n.7 (discussing historical use of criminal forfeitures as punishment in England and United States). Indeed, while the Supreme Court has at times analyzed whether a particular *in rem* forfeiture is punitive, *see id.* at 330–34, the Court has noted that there is no need for such an assessment when the forfeiture was ordered against the criminal defendant himself. *See Alexander v. United States*, 509 U.S. 544, 559 n.4 (1993) ("[T]his case involves *in personam* criminal forfeiture not *in rem* civil forfeiture, so there was no threshold question concerning the applicability of the Eighth Amendment."); *see also Dubose*, 146 F.3d at 1145 ("Unlike the legal fiction that civil in rem forfeiture is a proceeding against the 'guilty' property, criminal in personam forfeiture is a proceeding against the wrongdoer personally and therefore constitutes punishment and a 'fine' within the meaning of the Excessive Fines Clause.").

Accordingly, the order of forfeiture imposed against Beecroft personally at sentencing is punitive and therefore subject to the Excessive Fines Clause.

2

"[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. We generally consider four factors when weighing the gravity of an offense: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United*

*States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122
(9th Cir. 2004).

In large part, these considerations underscore the severity
of Beecroft's crimes. Beecroft participated for years in a
massive conspiracy that included more than 400 fraudulent
transactions and more than 200 residential properties. As the
district court explained, these were "very serious crimes . . .
[that] had a tremendously damaging effect on our economy
and particularly on those who have been harmed by the
fraud." The PSR described it as a scheme of
"incomprehensible" magnitude to "pillage financial
institutions and the Las Vegas community." The crimes cost
banks tens of millions of dollars, and the PSR opined that
their consequences would last for years to come. Although
Beecroft did not orchestrate the scheme or share the same
level of culpability as Grimm or Mazzarella, both the district
court and PSR agreed that she was central to the fraud's
success.

The penalties that may be imposed for Beecroft's crimes
confirm their significance. For each count of conviction,
Beecroft could be sentenced to serve up to 30 years in prison.
*See* 18 U.S.C. §§ 1341, 1343, 1349. And the Guidelines
calculations—especially instructive as they reflect the
particular circumstances of Beecroft's crimes, *$100,348.00 in
U.S. Currency*, 354 F.3d at 1122—provide a range of
imprisonment from 210 to 262 months per count. Beecroft
could be ordered to pay a fine of up to $1 million per count,
with a Guidelines range of $20,000 to $1 million. In short,
both in effect and in Congress's judgment as expressed
through the applicable statutory penalties, Beecroft's crimes
were extensive and grave.

Comparing the gravity of these offenses to the forfeiture order, *id.* at 1123, we have little trouble concluding that the amounts of forfeiture ordered on Beecroft's four subsidiary counts of conviction (Counts 10, 11, 13, and 14) are not excessive. For those counts, Beecroft was ordered to forfeit $330,000; $305,000; $325,000; and $460,000, respectively. Each amount is substantially less than the $1 million maximum fine authorized both by statute and by Beecroft's Guidelines range, before even considering the prison time available for each conviction as well. To be clear, these sums of money are not trivial. But neither were Beecroft's crimes. The district court did not err, let alone clearly err, in setting these amounts of forfeiture at less than half the otherwise available fines. *See, e.g.*, *United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1060 (9th Cir. 2014) (upholding forfeiture order that fell "far below the maximum statutory fine" and was "only 2.6 times the maximum" Guidelines fine); *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (upholding forfeiture order ten times greater than maximum Guidelines fine).

The $107 million Beecroft was ordered to forfeit for the conspiracy (Count 1) stands apart. As with the other counts of conviction, for Count 1 Beecroft could be fined no more than $1 million (with a Guidelines range beginning as low as $20,000). In other words, for Count 1, Beecroft was ordered to forfeit a sum more than *100 times* greater than the maximum fine allowable and more than *5,000 times* greater than the lower-end of the Guidelines range. Even accounting for the fact that Beecroft faced potentially significant prison time as well, *see Mackby*, 339 F.3d at 1018, this is a tremendous disconnect between the forfeiture amount and Beecroft's legally available fine. Indeed, such a disconnect stands out even among forfeiture orders which have

previously been held grossly disproportional. For example, in *Bajakajian*, the Supreme Court held a $357,144 forfeiture order to be unconstitutionally excessive, observing that the order was "many orders of magnitude" larger (roughly 70 times larger, to be more specific) than the $5,000 maximum fine authorized for the defendant's offense. 524 U.S. at 339–40. We have rejected forfeiture orders with far less disparity. *See, e.g.*, *$100,348.00 in U.S. Currency*, 354 F.3d at 1123 (holding that a forfeiture amount between 3 and 20 times greater than maximum fine would be unconstitutionally excessive); *Thurman Street*, 164 F.3d at 1198 (rejecting forfeiture amount "more than 40 times the maximum fine permitted under the Guidelines").

The government cites no case upholding a forfeiture order with a disparity similar to the one here, and it has not attempted to argue that the $107 million otherwise corresponds to injuries sustained by the government or the banks.[9] *Cf. Mackby*, 339 F.3d at 1018–19 (discussing governmental harms caused by defendant's crimes); *Thurman Street*, 164 F.3d at 1198 ("[T]his amount bears no reasonable correlation to any injury suffered by the government or any

---

[9] Indeed, the government wholly ignores the Eighth Amendment excessiveness analysis and instead argues that, because $107 million was a factually accurate accounting of the crime's proceeds, the district court had no discretion to reduce the mandatory forfeiture amount. The government's argument conflates discretionary reductions with constitutionally required ones. It is correct that, in this case, forfeiture is statutorily required and a district court cannot simply elect to reduce it as a discretionary matter. But the court can—and must—make such a reduction where the order would otherwise be unconstitutional. *Cf. Newman*, 659 F.3d at 1240–41 (contrasting constitutional limitations on forfeiture with discretionary reductions). To hold otherwise would be tantamount to concluding that the Eighth Amendment simply does not apply to statutorily mandated forfeitures.

other party, as the fraudulently-obtained loan will be fully repaid."). And, because the propriety of the forfeiture amount was not even discussed at sentencing, no such justification is apparent on the record before us.

We have little doubt that the Eighth Amendment allows Beecroft to be ordered to forfeit a substantial sum of money for her participation in such an extensive and damaging conspiracy. But difficulty remains with the exceptional amount of forfeiture the court did impose. Without even an *argument* supporting the propriety of the $107 million forfeiture, we have no choice but to conclude that an order which so vastly outpaces the otherwise available penalties for Beecroft's criminal activity runs afoul of the Excessive Fines Clause. Even on plain-error review, we must vacate the forfeiture order with respect to Count 1 and remand to the district court for reconsideration of that amount in light of the Eighth Amendment's Excessive Fines Clause. *See United States v. Ferro*, 681 F.3d 1105, 1117 (9th Cir. 2012) (remanding for excessiveness analysis); *Thurman Street*, 164 F.3d at 1198 (same).

V

For the foregoing reasons, we **AFFIRM** the order of restitution and the amounts of forfeiture ordered on Beecroft's convictions for Counts 10, 11, 13, and 14. We **VACATE** the $107 million in forfeiture ordered on Beecroft's conviction for Count 1, and we **REMAND** for reconsideration of the appropriate amount of such forfeiture.