# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-1111, 03-1114, 03-1140, 03-1172, 03-1176, 03-1180, 03-1408, 03-1590, 04-1014, 04-1035, 04-1057, 04-1072, 04-1073, 04-1095, 04-1125

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/*
*Cross-Appellant*,

v.

MICHAEL SPANO, SR., *et al.*,

*Defendants-Appellants/*
*Cross-Appellees*,

and

BONNIE LAGIGLIO,

*Defendant-Appellant*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 348—**John F. Grady**, *Judge*.

_____

ARGUED APRIL 5, 2005—DECIDED SEPTEMBER 1, 2005

_____


Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. The seven defendants were convicted after a three-month jury trial of a variety of federal offenses, including mail fraud, RICO, and money laundering, arising out a scheme to defraud the Town of Cicero, Illinois. (Bonnie LaGiglio, however, was convicted only of a tax offense.) They received prison sentences ranging from 41 to 151 months, as well as being ordered to forfeit a total of $4 million in proceeds of their fraud (plus two real estate parcels)—a fraud that cost the Town more than $10 million. Their appeals, together with the government's cross-appeal, which seeks higher sentences for all but Bonnie LaGiglio, present more than 20 issues, but many of them are too insubstantial to require discussion. Because the sentences were based in part on factfindings made by the judge, the government concedes that the defendants are entitled to the limited remand authorized by *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005), though to nothing more. The force of the concession is obscure, in light of the government's cross-appeal; but that is for later.

Cicero is self-insured for its employees' health benefits, and until 1992 used the Travelers insurance company to process the bills submitted to the Town by providers of health care to its employees. That year the Town switched to Specialty Risk Consultants. SRC, created by two of the defendants, was the instrument of the fraud; other defendants were Town officials, including the President of the Board of Trustees (i.e., mayor), Loren-Maltese. Millions of dollars that the Town paid to SRC were siphoned to a partnership, Plaza Partners, which was a tool of the conspirators and provided them with money and other things of value, including a golf course and a horse farm. The fraud, which continued until it was unmasked in 1996, has done nothing for the reputation of Cicero, a town notorious as the headquarters of Al Capone, *Hanania v. Loren-Maltese*, 212

F.3d 353, 354 (7th Cir. 2000); Laurence Bergreen, *Capone: The Man and the Era* 97-99 (1996); Matthew Engel, "Spirit of Capone Lives on in Mobtown, Illinois: Mayor's $12m Scam Follows in Footsteps of Scarface, Baldy and the Big Tuna," *Guardian (London)*, Aug. 31, 2002, p. 3, and with an 80-year history of links to organized crime. "Is Cicero Ready for Reform?," *Chicago Tribune*, Apr. 3, 2003, p. 22.

Loren-Maltese, though a key player in the fraud by virtue of her position as the Town's mayor, received only modest remuneration—primarily reimbursement of 100 percent of her medical bills; Cicero's benefits plan entitled her to only 80 percent. She points out that there was a practice predating the fraud of reimbursing additional amounts upon written authorization by a Town official; her predecessor had been reimbursed for 100 percent of his medical bills on this basis, and presumably she would have been as well even if SRC had not replaced Travelers as the administrator of the Town's plan.

She argues that if the extra coverage she received was not in exchange for her complicity in the fraud, she is not guilty of the form of fraud, with which she was charged, that consists of an official's depriving the government of his or her honest services. 18 U.S.C. §§ 1341, 1343, 1346; *United States v. Martin*, 195 F.3d 961, 965-66 (7th Cir. 1999). The argument is a non sequitur. A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants, *Lombardo v. United States*, 865 F.2d 155, 159-60 (7th Cir. 1989); cf. *United States v. Moede*, 48 F.3d 238, 242 (7th Cir. 1995); *United States v. Blasini-Lluberas*, 169 F.3d 57, 65 (1st Cir. 1999); *United States v. Oplinger*, 150 F.3d 1061, 1065 (9th Cir. 1999), just as a conspirator doesn't have to benefit personally to be guilty of conspiracy—a point so obvious that we can't find a case that states it, although it is implicit in statements of the elements

of conspiracy, of which personal benefit is not one. E.g., *United States v. Duran*, 407 F.3d 828, 835-36 (7th Cir. 2005); *United States v. Miller*, 405 F.3d 551, 555-56 (7th Cir. 2005). For that matter, neither the scheme to defraud, *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002); *United States v. Pimental*, 380 F.3d 575, 585 (1st Cir. 2004), nor the conspiracy, e.g., *United States v. Bond*, 231 F.3d 1075, 1079 (7th Cir. 2000); *United States v. Martin*, 228 F.3d 1, 10-11 (1st Cir. 2000), has to succeed in inflicting harm for the participants to be guilty.

In the case of a successful scheme, the public is deprived of its servants' honest services no matter who receives the proceeds. In any event there was evidence that as a reward for her participation Loren-Maltese received accelerated reimbursement and, more important, reimbursement of 100 percent of the medical expenses incurred by members of her family; there was no evidence that her predecessor had received such largesse.

She makes the related complaint that she should not have been found liable to forfeit more than $3 million of illegal proceeds, since so little of that amount found its way into her pocket. But the proceeds of a conspiracy are a debt owed by each of the conspirators. *United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003); *United States v. Masters*, 924 F.2d 1362, 1369-70 (7th Cir. 1991); *United States v. Edwards*, 303 F.3d 606, 643-44 (5th Cir. 2002). It would be absurd to treat them more leniently than the law treats a lawful partnership, all of whose members are severally as well as jointly liable for the partnership's debts.

A number of cases, it is true, though none in this circuit, require the defendant to forfeit only so much of the proceeds (not received by him) of the fraud as were foreseeable to him, e.g., *United States v. Fruchter*, 411 F.3d 377, 384 (2d

Cir. 2005); *United States v. Bollin*, 264 F.3d 391, 419 (4th Cir. 2001); *United States v. Corrado*, 227 F.3d 543, 558 (6th Cir. 2000); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995), by analogy to the liability of a conspirator for only those misdeeds of his coconspirators that were foreseeable by him. *Id.* Other cases do not discuss this requirement. We have found no case that rejects it, but we note that there is a difference between criminal liability for the acts of others and liability on a debt created by partners in a criminal scheme. No matter; Loren-Maltese authorized payments by the Town to SRC and knew that SRC was a fraud and so should have foreseen the possibility of a massive loss. She does not argue the contrary or even that foreseeability is required for a forfeiture.

The only other significant issue she raises concerns the judge's exclusion, as being unreliable, of minutes of meetings of the Town's Board of Trustees held several months after the government's investigation of the fraud became public knowledge. Loren-Maltese presided at meetings of the Board and other conspirators were among its members. The minutes of the meeting of January 6, 1997, contain a statement by one of the conspirator members (though he was acquitted), DeChicio, that no payments had been made by the Town to SRC since October 1996. That was false. A week later the minutes were amended to state that at the January 6 meeting Loren-Maltese had twice asked DeChicio whether any payments had been made to SRC "since the October 1996 Board Meeting at which time the board directed no further monies be paid to [SRC] unless by Town Board approval." Neither the October board meeting minutes nor the January 6 meeting minutes had mentioned any such direction. The inference of doctoring, even in the case of the unamended version of the January 6 minutes, is strong, and the public-records exception to the hearsay rule

is inapplicable when the "circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167-68 (1988).

The provision is tailor-made for a case in which the records are controlled by the defendants themselves rather than by clerks assumed to be disinterested. *Reynolds v. Green*, 184 F.3d 589, 596 (6th Cir. 1999); *Peppers v. Ohio Dept. of Rehabilitation & Correction*, 553 N.E.2d 1093, 1094-95 (Ohio App. 1988); compare *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995). As we explained recently in *Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005), with reference to the parallel hearsay exception for business records, Fed. R. Evid. 803(6), "when the record keeper, rather than being a clerical or professional employee, is a principal with a strong motive to falsify the records, the district judge may deem them so unreliable as to be unworthy of consideration by the jury; in the language of the rule, they are to be excluded if 'the method or circumstances of preparation indicate lack of trustworthiness.' See *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992); *Bracey v. Herringa*, 466 F.2d 702, 704-05 (7th Cir. 1972); *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993)."

Bonnie LaGiglio was the wife of one of the principal conspirators. Her name appears in the signature space of countless checks issued by Plaza Partners. In addition, funds that passed from the Town to SRC to Plaza Partners were disbursed by the partnership to her and reported on her income tax returns. If her signature on the checks was genuine, the jury was entitled to infer that she knew that the partnership was an instrument of fraud and thus knowingly helped it to succeed. Although the judge found "that there is simply insufficient evidence for this jury to conclude that she knew about the fraud against the town," that finding is consistent with her conviction for conspiracy to impede the

IRS in the assessment and collection of taxes. 18 U.S.C. § 371. The evidence revealed that she knew that Plaza Partners was a device for enabling her husband to avoid reporting income to the IRS, and thus knowingly assisted him in that project.

She claims that her husband forged all her signatures. The jury was shown handwriting exemplars—that is, signatures of Bonnie LaGiglio known to be genuine—and asked to compare them with the signatures in her name on the checks and on other documents of Plaza Partners. No handwriting expert testified about the genuineness of the contested signatures. The checks and other documents were all copies, and in closing argument the prosecutor began to argue that handwriting experts are unable to authenticate signatures on copies. The defense rightly objected on the ground that no expert testimony or other basis had been provided for that implausible argument, and the judge ordered it stricken. It is doubtful that the argument helped the prosecutor; told that even an expert can't verify the genuineness of signatures on copies, a juror asked to do just that might doubt his ability to do so, and vote to acquit. In any event, no rule of evidence makes a jury incompetent to determine the genuineness of a signature by comparing it to a signature known to be genuine. Fed. R. Evid. 901(b)(3); *United States v. Papia*, 910 F.2d 1357, 1366-67 (7th Cir. 1990); *United States v. Saadey*, 393 F.3d 669, 679-80 (6th Cir. 2005); *United States v. Wylie*, 919 F.2d 969, 978 (5th Cir. 1990); *United States v. Woodson*, 526 F.2d 550, 551-52 (9th Cir. 1975) (per curiam).

All the defendants complain about a pair of incidents involving the jury. Cicero has, as we noted, a long history of being a center of organized crime. During the trial one of the jurors brought into the jury room a book that discussed organized crime in Cicero in the 1920s to 1940s (a period

that encompassed the Capone era—he was active in Chicago from 1920 to 1931, becoming boss of the Chicago mob in 1925). The other jurors reported this juror to the judge, who removed him from the jury but concluded after talking to the other jurors that they had not been contaminated by their exposure to the book. The judge observed realistically that most Chicagoans have some awareness of the association between Capone and Cicero.

The day after the jury was discharged, a Chicago newspaper reported that one of the jurors said that Spano, Sr.'s reputed mob connections had been mentioned during the jury deliberations. The judge did not think that the newspaper article required him to conduct a hearing at which the jurors would be asked what exactly they had heard about Spano, Sr.'s mob connections. Ordinarily when extraneous materials are brought into the jury room, a hearing is required (as in the case of the book about Cicero) to determine whether the jurors' deliberations were fatally compromised by their exposure to the materials. *Remmer v. United States*, 347 U.S. 227, 229 (1954); *United States v. Reynolds*, 64 F.3d 292, 295-96 (7th Cir. 1995). But that is not a hard and fast rule. As we explained in *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005), "the extraneous communication to the juror must be of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury. How much inquiry is necessary (perhaps very little, or even none) depends on how likely was the extraneous communication to contaminate the jury's deliberations. *Evans v. Young*, 854 F.2d 1081, 1083-84 (7th Cir. 1988); *Dyer v. Calderon*, 151 F.3d 970, 974-75 (9th Cir.1998) (en banc); *United States v. Williams-Davis*, 90 F.3d 490, 499-501 (D.C. Cir. 1996); see generally *Oswald v. Bertrand*, 374 F.3d 475, 477-78, 480 (7th Cir. 2004)." See also

*United States v. Stafford* , 136 F.3d 1109, 1112-13 (7th Cir. 1998). Jurors after all know many things that are not presented to them in the course of the trial, and doubtless use much of that background knowledge during their deliberations. Lots of things mentioned in jury deliberations are outside the record. Were the report of a juror who claims to have heard such a thing mentioned enough to require a hearing, few trials would end without a post-trial interrogation of the jurors; jury service would be even less popular than it is.

This trial lasted three months and the deliberations alone lasted 11 days; it is unlikely in the extreme that extraneous speculations were never voiced in the jury room. The trial judge, having observed the jury carefully and having been impressed by the jurors' conscientiousness (remember how they reacted to the book), did not abuse his discretion in concluding that the likelihood that a reference to Spano, Sr.'s possible connections to organized crime had polluted the jury's consideration of the case was too slight to warrant hauling the jurors before him for an examination. See, e.g., *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996); *United States v. Lloyd*, 269 F.3d 228, 238-39 (3d Cir. 2001); *United States v. Sanders*, 962 F.2d 660, 668-74 (7th Cir. 1992); *United States v. Bruscino*, 687 F.2d 938, 940-41 (7th Cir. 1982) (en banc).

Taylor, a key conspirator who had turned state's evidence, was a principal witness for the government. After the trial the defendants discovered that he had been an alcohol abuser and marijuana user during the conspiracy. They moved for a new trial on the basis of this newly discovered evidence, which they would have liked to impeach him with. It is improper to impeach a witness by presenting evidence that he has engaged in criminal or otherwise illegal or socially reprobated behavior unless the evidence

undermines the credibility of his testimony beyond what-ever undermining would be accomplished just by besmirch-ing the witness's character. *United States v. Mojica*, 185 F.3d 780, 788-89 (7th Cir. 1999); *Henderson v. DeTella*, 97 F.3d 942, 949 (7th Cir. 1996); *United States v. Robinson*, 956 F.2d 1388, 1397-98 (7th Cir. 1992). Were there any indication that Taylor had been high when he was testifying, that would certainly have been appropriate to point out to the jury; and likewise if there were any reason to think that alcohol or marijuana had seriously impaired his memory or had prevented him from understanding the events about which he testified when they took place. *Id.* at 1398; *Jarrett v. United States*, 822 F.2d 1438, 1445-46 (7th Cir. 1987); see *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995); compare *United States v. Smith*, 156 F.3d 1046, 1054-55 (10th Cir. 1998). There was no reason to think either of these things. Nothing in Taylor's demeanor or testimony sug-gested to the judge that he was impaired to any degree. And there could be no doubt of his having been able to observe accurately the acts of the defendants during the fraud, for he had been the general manager of SRC. Had he been drunk, high, or otherwise behaving erratically during the conspir-acy, the defendants, with whom he had had continuous dealings over a three-year period, would have noticed, and would have prompted their lawyers to cross-examine him accordingly—which the lawyers did not do.

The defendants are, however, entitled to a *Paladino* remand—which brings us to the government's cross-appeal. The government asked us in its brief to affirm the defen-dants' convictions and sentences, but, "alterna-tively"—meaning, presumably, that if we don't affirm the convictions and sentences—to order the defendants (all but Bonnie LaGiglio) to be resentenced in accordance with the grounds presented in the cross-appeal. *Paladino* prevents us

from affirming the sentences until the trial judge has advised us whether, had he known the federal sentencing guidelines were merely advisory, he would have given the defendants lighter sentences. 401 F.3d at 483-84.

There are two ways to interpret the government's position. One is that unless we affirm the sentences here and now, we should (if the cross-appeal has merit) remand for resentencing. The other is that, should there be a *Paladino* remand (as there must be), we should wait and see whether the remand results in a different sentence for any of the defendants; if not and if in consequence we affirm the original sentences, then the government has obtained its preferred result, and its alternative submission (that the defendants be resentenced) becomes moot. If the second interpretation is correct, we could suspend consideration of the cross-appeal until we hear from the judge, and if he decided that he would not have sentenced differently we would then dismiss the cross-appeal. But if the cross-appeal has identified errors, it is better that we point them out now, rather than have to order the defendants resentenced after the *Paladino* remand. So let us determine the merits of the cross-appeal and then return to the question of the precise sense in which the government is demanding sentencing relief "alternatively."

The government contends that the sentences of some of the defendants should have been enhanced because they had corrupted a "financial institution," U.S.S.G. § 2F1.1(b)(6) (1997) (now § 2B1.1(b)(13)); *United States v. Lauer*, 148 F.3d 766, 768-70 (7th Cir. 1998), namely SRC. The term "financial institution" is defined to include insurance companies and "similar" enterprises. U.S.S.G. § 2F1.1 Application Note 14 (1997) (now § 2B1.1 Application Note 1). SRC processed claims, which is a typical insurance-company function. But what makes an insurance company

a financial institution is that it invests its premiums in order to create a fund out of which to pay claims; it is a financial intermediary. See  Thomas A. Smith, "Institutions and Entrepreneurs in American Corporate Finance," 85 *Cal. L. Rev.* 1, 5 (1997). SRC was not an insurance company and did not engage in financial intermediation. Money flowed through it, from the Town treasury to claimants and of course to the defendants, so it was "intermediate" between Town and claimants in a literal sense. But that is no different from the situation of a grocery store, which takes in money from its customers and pays it out to its owners and suppliers. Compare *United States v. Ferrarini*, 219 F.3d 145, 160-62 (2d Cir. 2000).

The government next contends that in calculating the loss caused by the fraud the judge should have disregarded all costs incurred by SRC in processing claims. The reasoning is that if the defendants are allowed to deduct those costs in figuring the Town's loss, inefficient frauds will be penalized less severely than efficient ones, because the costs subtracted from the proceeds of the fraud to determine the loss to the victim of the fraud will be larger and the net proceeds therefore smaller. The government is correct that the fraudster's costs shouldn't be deducted, *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003), any more than the costs of a burglar's tool should be deducted in determining the loss suffered by the victim of the burglary. The objective in calculating the loss inflicted by a crime is to determine how much worse off the victim was made by the crime, see, e.g., *United States v. Frost*, 281 F.3d 654, 659 (7th Cir. 2002), and so the costs incurred by the criminal *to commit the crime* are irrelevant. But the qualification is vital, since the criminal may have expenses unrelated to the crime. That is the case here. Out of the total amount that the Town paid SRC, $33.8 million, SRC paid $22 million in

legitimate claims and incurred costs to process them. Had the Town hired a legitimate claims processor, the price charged the Town by the processor would have reflected his costs. The loss to the Town was the difference between what it paid SRC to process the legitimate claims that SRC paid out and what it would have paid a legitimate processor to process those claims. A defendant is entitled "to deduct from the loss calculation any value the defendant gave the victim at the time of the fraud." *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998).

The judge did this. But the government is right that having determined that the loss caused by the fraud was $10.6 million the judge should not have rounded this number off to below $10 million, which reduced the length of the defendants' sentences. The judge's reason was that $10.6 million was merely an estimate, which might therefore be off—might indeed be off by $600,001. No doubt. But unless he thought the estimate biased, he had no basis for rounding down any more than he would have had for rounding up. Reasonable estimates are proper predicates for calculating loss. U.S.S.G. § 2F1.1 Application Note 9 (1997) (now § 2B1.1 Application Note 3(C)); *United States v. Bhutani*, 266 F.3d 661, 668 (7th Cir. 2001); *United States v. Snyder*, 291 F.3d 1291, 1295-96 (11th Cir. 2002); *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir. 2000).

This was error and ordinarily an error in a sentence requires resentencing. But not if the government would prefer the original sentences to stand than to take its chances with a resentencing that could result in lower sentences even after the error that the judge committed against the government (the rounding down) is corrected. If the defendants are resentenced, then since the guidelines are now merely advisory the district judge will not be strictly bound by the sharp line drawn by the sentencing guidelines

between frauds that cause a loss of $9,999,999 and those that cause a loss of $10,000,000. Were he to decide that an estimate so close to the line did not, in the circumstances of this case, warrant the bump up in sentences that the guidelines decree at $10 million, and on that basis decided that the original sentences were proper, we would be unlikely to deem his action an unreasonable departure from the guidelines, and we would therefore have to affirm. This means that if, in a *Paladino* remand, the judge determined that he would have given the defendants the same sentences he imposed originally even if he'd known the guidelines were merely advisory, his decision would not be invalidated by the error that we have found. Those sentences would therefore stand.

If, however, the judge is required to resentence the defendants because of the error he committed against the government, he may conceivably give them lower sentences, the guidelines no longer being mandatory. The question is whether the government wants to run that risk. One of us asked the government's lawyer at argument: "Do you want to pursue the cross-appeal after *Booker*? Of course, if you succeed on any aspect of the cross-appeal, instead of there being a limited *Paladino* remand, there will be a vacatur and a straight remand with instructions to resentence and, of course, at the resentencing, [the district judge] can give the very same sentence he gave if not a lower one." To which the lawyer replied: "We've considered this very carefully, your honor, and we're prepared to take our chances. We are pursuing the cross-appeal." We interpret this to mean that the government wants the defendants resentenced—all but Bonnie LaGiglio, who, therefore, is alone entitled to a *Paladino* remand, pending which we retain jurisdiction of her appeal. We vacate the judgments of the other defendants and remand for resentencing.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*