T.C. Memo. 2012-214

UNITED STATES TAX COURT

BETTY LOREN-MALTESE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1069-05.                                  Filed July 30, 2012.

<u>John James Morrison</u>, for petitioner.

<u>Sean R. Gannon</u> and <u>Katie Chapman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Betty Loren-Maltese is a locally well-known Illinois

public servant who until recently was serving time in federal prison for her role in an

insurance scheme to defraud the Town of Cicero of more than $10 million.  <u>See</u>

<u>United States v. Spano</u>, 421 F.3d 599, 602 (7th Cir. 2005).  The government also

indicted her on charges of criminal-tax fraud, but the criminal-tax trial led to a hung jury and the charges were dismissed. The Commissioner claims that Ms. Loren-Maltese fraudulently underreported income on her 1994 income tax return by omitting two very substantial conversions of campaign funds to personal use. This, he argues, justifies imposing on her a civil-fraud penalty and eliminates the bar of the statute of limitations. Ms. Loren-Maltese was mostly silent during her trial in our Court, relying on her attorney's advice to take shelter under the Fifth Amendment.

## OPINION

It's the facts that make this case interesting, but there are three issues of law that color its background: the general rules of tax fraud, the proper tax treatment of money taken by a politician from her campaign fund for personal use, and the effect of taking the Fifth Amendment in civil litigation. We'll quickly review them.

Tax fraud is important in this case because fraud stops the clock on the statute of limitations, and so much time has passed that proving fraud is the only way the Commissioner can win. See sec. 6501(a), (c).[1] The question is: Can the

---

[1] Unless we say otherwise, all section references are to the Internal Revenue Code for the year at issue, and the Rule references are to the Tax Court Rules of Practice and Procedure.

Commissioner prove, by clear and convincing evidence, that Ms. Loren-Maltese intentionally evaded a tax that she believed was due? To do so, the Commissioner must establish that (1) an underpayment exists; and (2) some portion of the underpayment was due to fraud. See sec. 7454(a); Rule 142(b); Duncan & Assocs. v. Commissioner, T.C. Memo. 2003-158, 2003 WL 21233527, at *4. Fraud requires a state of mind--it is commonly defined as an "intentional wrongdoing" on the part of the taxpayer with "the specific purpose to evade a tax believed to be owing." McGee v. Commissioner, 61 T.C. 249, 256 (1973), aff'd, 519 F.2d 1121 (5th Cir. 1975).

Because it's rare to have direct proof of someone's state of mind, we usually have to rely on circumstantial evidence. Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). We consider the entire record. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). We may infer fraud from any conduct calculated to mislead or conceal. Id. at 93; Acker v. Commissioner, 26 T.C. 107, 112 (1956). And we look for "badges of fraud"--including the ones the Commissioner argues are present in this case:

- 4 -

- inadequate records;

- implausible or inconsistent explanations of behavior;

- concealing assets;

- engaging in illegal activities; and

- attempting to conceal activities.

Bradford v. Commissioner, 796 F.2d 303, 307-08 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. We also look at the taxpayer's background, including her sophistication, experience, and education. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

The second legal issue in this case is the use of campaign funds. Ms. Loren-Maltese controlled two of these: the Republican Committeeman Fund for the Town Republican Organization of Cicero (Organization Fund), and the Betty Loren-Maltese Committeeman Fund (Committeeman Fund). Cicero's town attorney, Burt Odelson, told Ms. Loren-Maltese before she filed her 1994 return that the Illinois state election code didn't require her to file financial reports or publicly disclose contributions or expenditures for the Committeeman Fund. The Organization Fund, however, was required to file publicly disclosed financial reports that gave detailed

lists of contributions and expenditures.[2]  He also correctly explained the tax consequences of taking money from the funds--Ms. Loren-Maltese could supplement her salary by taking money from either the Organization Fund or the Committeeman Fund to buy something for herself or to make an investment for her own personal benefit, but the money would be personal income to her and she'd owe tax on it in the year that she took it.  See United States v. Scott, 660 F.2d 1145, 1151 (7th Cir. 1981); Stratton v. Commissioner, 54 T.C. 255, 282 (1970).  She could also buy things or make investments as a fund's agent, and, if she used what she bought for the fund's intended political purpose would not have to include that money in her income,.  See Stratton, 54 T.C. at 282; Rev. Rul. 71-449, 1971-2 C.B. 77.

---

[2] In 1994 Illinois law allowed public officials, who like Ms. Loren-Maltese, were also political-party officials, to raise money from donors--in their capacity as party officials--in amounts that they could keep secret.  This was because political-party officials were not considered public officeholders under Illinois law, which required only political committees for public officeholders to disclose committee contributions and expenditures.  See 10 Ill. Comp. Stat. Ann. 5/9-1.3, 5/9-1.7, 5/9-10 (West 2010).  Illinois sewed up this loophole in 1995 by redefining members of political-party committees as public officeholders.  1995 Ill. Legis. Serv. P.A. 89-405 (H.B. 1498), sec. 10 (West).  This made Ms. Loren-Maltese's Committeemen Fund subject to the same public financial-disclosure requirements as any other political fund beginning November 8, 1995.  See 10 Ill. Comp. Stat. Ann. 5/9-1.3, 5/9-1.7.

The third and final legal issue in this case is the consequence of Ms. Loren-Maltese's taking the Fifth Amendment. Like the other legal issues, the law here is well settled, and Ms. Loren-Maltese's steadfast invocation of her right not to incriminate herself makes the Commissioner's job at least a bit easier. The parties took pains to argue about whether Ms. Loren-Maltese's invocation of the Fifth was justified--but that doesn't matter much here because even a valid invocation of the Fifth Amendment allows us to draw a negative inference from her refusal to answer a question if the Commissioner produces some additional supporting evidence. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).

We can also draw inferences from her silence if, under the circumstances, it would've been natural for her to object. See United States v. Hale, 422 U.S. 171, 176 (1975). This later principle is not constitutional, just an acknowledgment of human nature. The original Cicero made the point 2,000 years ago in his oration exposing the plot of Lucius Catilina and his friends to plunder their government's treasury.[3] He observed that people have a natural tendency to defend their reputation, and that silence in the face of accusations suggests that there might be

---

[3] And, allegedly, to murder the Senate, overthrow the Republic, and set their city on fire. See Z. Yavetz, "The Failure of Catiline's Conspiracy", 12 Historia: Zeitschrift für Alte Geschichte 485, 485 n.1 (1963).

some merit to the charges. The Latin is more succinct: *Cum tacent, clamant*. M. Tullius Cicero, First Oration Against Lucius Catilina: Delivered in the Senate 21.

## FINDINGS OF FACT

The silence that shouts out here arose from Cicero, Illinois, a suburb of Chicago that sits on its western hip like a well-holstered gun, and that has a colorful history that reaches back into the 1920s when Al Capone took refuge there. (Capone, though best known for his failure to file accurate tax returns, was also apparently well known for superintending a large number of saloons and other illegal enterprises in Cicero during Prohibition.) Some of this past is not dead, and is not even past--as Ms. Loren-Maltese remarked at trial: "There's always investigations in Cicero."

With a population of around 80,000, Cicero is one of the largest municipalities in Illinois. It also has the unusual distinction of being its own township. Cicero, Ill., Code of Ordinances pt. I (2001). This makes Cicero more autonomous than most municipalities: It runs its own elections, administers its own finances (although Cook County may review some township functions, such as property-tax assessments), and provides services for its citizens that are ordinarily provided by counties in Illinois. See, e.g., 60 Ill. Comp. Stat. Ann. 1/85-10 (West 2006 & Supp. 2012) (powers generally); 60 Ill. Comp. Stat. Ann. 1/85-13 (health

and safety authority); 60 Ill. Comp. Stat. Ann. 1/235-5 (taxation authority). Cicero also has its own police department, fire department, housing department, liquor commission, etc. At the time of the events leading to this case, Cicero was divided into 80 voting precincts, each of which had at least one precinct captain for each party. The precinct captain, who is appointed by the committeeman or another elected official, marshals support for party nominees. The Town is governed by a board of trustees and by the town president, both of which hold considerable power in the Town's day-to-day affairs.

Ms. Loren-Maltese was the President of Cicero and the Republican Committeeman of Cicero Township in 1994. She is also the widow of Frank Maltese, a "prominent Cicero politician who confessed to being a mob bookmaker and pleaded guilty to a federal gambling charge." Hanania v. Loren-Maltese, 212 F.3d 353, 354-55 (7th Cir. 2000) (citing United States v. Maltese, No. 90 CR 87-19, 1993 WL 222350 (N.D. Ill. June 22, 1993)). Like his wife, Mr. Maltese was sentenced to prison, but he died of natural causes before he began serving his sentence.

Ms. Loren-Maltese's political roots in Cicero are deep, and sprouted from her job as editor of The Cicero Observer, a Republican newsletter about the Town's politics. She was also an important supporter and precinct captain for former Town

President Henry Klosak.  She served as his presidential aide and, since 1980, held several appointments in Town government with a portfolio of subjects from Section 8 housing to traffic violations and even deputy court-clerking duties.  Mr. Maltese then appointed her to be the town's deputy liquor commissioner when the previous one resigned during an FBI investigation into his practice of taking bribes and skimming money off liquor-license renewal fees.  See United States v. Maltese, 1993 WL 222350, at *2.

Ms. Loren-Maltese had more effective power than most deputy liquor commissioners, because the incumbent liquor commissioner was serving at the same time as president of Cicero, and most of his liquor-commissioner-related duties fell to her.  The Town had problems on this front--when Ms. Loren-Maltese took over the job, there weren't any records, and she had to go up and down the streets of the Town to find out who was selling liquor and who had a license.  She also held hearings in cases arising from violations of the liquor laws and license revocations, and she even worked on a revision of the Town's liquor ordinance.

On January 12, 1993, Mr. Maltese (who himself had an active public life as simultaneously town assessor, head of the public-works department, and member of the Town's board of trustees) succeeded in securing his wife's appointment as interim president after Mr. Klosak died in office.  She then won election in her own

right in April 1993. Ms. Loren-Maltese claims she was a "political neophyte," yet she managed to be reelected for three additional four-year terms in some hotly contested elections and remained president until convicted in September 2002. She was also not above being a bit aggressive in dealing with political rivals. See Cruz v. Town of Cicero, Ill., 275 F.3d 579, 588-89 (7th Cir. 2001) (holding that a reasonable jury could conclude that Ms. Loren-Maltese was motivated by improper animus when she rejected a developer's condominium-conversion application in retribution for his repaying her "million-dollar favor" of approving a favorable lease with merely a bouquet of flowers.)

When Ms. Loren-Maltese became president, she was also appointed the Republican committeeman of Cicero Township and was later elected to a full term in that job too. Committeeman is a political position--the Republican committeeman of Cicero Township heads the Town Republican Organization of Cicero. In that position, she promoted Republican candidates for office and oversaw scores of precinct captains. The job also gave her control over the Organization Fund.

Her tenure in office was not tranquil. In October 1996 the Chicago Sun-Times ran an article that named her as a target of a government investigation. In June 2001 a federal grand jury indicted her and several coconspirators for

conspiracy to defraud the Town through a pattern of racketeering via multiple acts of bribery, money laundering, mail and wire fraud, official misconduct, and interstate transportation of stolen property.  Her criminal trial lasted about three months, culminating in a conviction on August 23, 2002, on all but one count of the indictment (the criminal tax charge later tried separately).  This put an end to her political career, and she was sentenced to eight years in prison.  The government then tried her separately on the criminal-tax charges, but the jury hung, and the government decided not to try her again.  See Gov't Motion to Dismiss Count 13 of the Above-Captioned Indictment, United States v. Spano, No. 1:01-cr-348 (N.D. Ill. Jan. 31, 2003), ECF No. 494.  Ms. Loren-Maltese and the other conspirators appealed their convictions and sentences to the Seventh Circuit, which upheld the convictions but remanded for resentencing.  See United States v. Spano, 421 F.3d 599 (7th Cir. 2005).  The trial court then upheld the original sentence, and she remained imprisoned until 2010.

Even though the criminal tax-fraud indictment was dismissed, the Commissioner was not through with Ms. Loren-Maltese.  He issued a notice of deficiency alleging civil tax-fraud for tax year 1994.  Ms. Loren-Maltese filed a

petition in our court while involuntarily living in a federal prison in California,[4] and we held a short trial in Chicago whose record was supplemented by the parties' stipulated admission--"as testimony and exhibits in this proceeding"--of slightly fewer than 10,000 pages of transcript and numerous exhibits from her criminal trials.[5]

The Commissioner boiled down this sea of information into a very detailed analysis of two transactions: Ms. Loren-Maltese's purchase of a 1993 classic black Cadillac Allante convertible, and her investment in a luxury golf course and clubhouse. The Commissioner contends that her withdrawal of more than $350,000 from the Committeeman Fund to finance the car and investment created taxable income and that she fraudulently tried to evade the tax due on that income.

---

[4] Our decisions are appealable to the circuit where the taxpayer resides when she files her petition unless the parties stipulate differently. Sec. 7482(b)(1)(A), (2). Ms. Loren-Maltese was a longtime resident of Cicero until she was incarcerated. Unless incarceration results in a change of residency, which we doubt but need not resolve here, our decision would be appealable to the Seventh Circuit unless the parties stipulate differently.

[5] We therefore accept as testimony for purposes of this trial all of the testimony that took place in the criminal trials, and we (like the parties) used the documentary evidence extensively. See, e.g., Hoover v. Commissioner, T.C. Memo. 2006-82, 2006 WL 1073427, at *1; Vardine v. Commissioner, T.C. Memo. 1969-57.

A.    The Car

In September 1994, Ms. Loren-Maltese visited a local dealer and bought a classic black limited-edition 1993 Cadillac Allante convertible for $53,512.40.  She paid with a check, and the check was drawn on the Committeeman Fund.  All the documents prepared by the dealer, which we find Ms. Loren-Maltese reviewed, show the owner as Betty Loren-Maltese (and not in any representative capacity for the Town of Cicero or the Republican Party)--including the Bill of Sale/Purchase Agreement, the Certificate of Origin, and the title and license-plate registration.  Ms. Loren-Maltese even transferred the license plate from her other personal car to the Cadillac.  She added the Cadillac to her personal automobile-insurance policy, and designated its use as "pleasure use" (even though her insurance agent, Eric Sundstrom, explained that if the Allante were owned by the Town it would need a separate commercial policy).  Ms. Loren-Maltese gave the dealership her personal information such as her address and driver's-license number.[6]  The name on the title creates a *prima facie* presumption under Illinois law that she is the owner.  See United States v. Ellis, 739 F.2d 1250, 1254 (7th Cir. 1984).

_____

[6] The exhibits included the title to a Jeep which the Town of Cicero bought that same year.  We observed that all the documents related to the Jeep identify the Town as purchaser and Ms. Loren-Maltese as the Town's duly authorized agent. We find that this shows that Ms. Loren-Maltese knew how to distinguish personal from government car ownership.

- 14 -

Paper formalities aren't conclusive, though.  See Stratton, 54 T.C. at 269, 282.  "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed."  Corliss v. Bowers, 281 U.S. 376, 378 (1930); Friedman v. Commissioner, T.C. Memo. 1968-145, aff'd, 421 F.2d 658 (6th Cir. 1970).  On this issue, the Commissioner points not just to the paper trail but to Ms. Loren-Maltese's silence at trial.  She invoked the Fifth on virtually every question about the car, including its purchase and her use of it, and how she reported (or rather didn't report) on her 1994 tax return her use of Committeeman Fund money to buy it.

Ms. Loren-Maltese, whose coiffure is legendary in Chicagoland, broke her Fifth Amendment silence on this subject only once--to tell us that though the car was a convertible, she didn't go "cruising around" Town with the top down because she "wouldn't want to mess up [her] hair."  On this narrow issue, we find her entirely credible, but the evidence that her use of the Cadillac was personal rather than political is overwhelming.  Though she was a good-humored, engaging, and credible witness when actually answering questions, her silence on substantive questions severely injured her case--not only because we specifically warned her that claiming the Fifth Amendment would allow us to draw a negative inference, but

because the Commissioner's voluminous evidence against her strongly supported that inference.

Ms. Loren-Maltese used money from her personal bank account[7] to pay the insurance premiums as well as for the annual license-plate registration renewals, gas, repairs, and maintenance for the car. Ms. Loren-Maltese, who has also been a licensed real-estate agent since the 1970s, even deducted gas and mileage for the car on her 1994 income tax return as a "real estate sales" business expense--which we find was clearly not a political purpose.

Shortly after she bought the car, Ms. Loren-Maltese called her secretary, Lauren Racanelli, down from her office to "see her new car" (while she was on her way to her summer home in Lakes of the Four Seasons in Crown Point, Indiana). Both Ms. Racanelli and Commander Clarence Gross (of the Cicero Police Department), and even her own administrative assistant, never saw the Cadillac at any political or campaign function, and there were numerous such events during Ms. Loren-Maltese's presidency.

Ms. Loren-Maltese refused to testify to the whereabouts of the Allante, but the evidence leads us to find that in 1994 the car wasn't even normally in Cicero,

---

[7] With the exception of two payments made in years not at issue made with funds from the Committeeman Fund--one for 1995 and one for 1997.

but rather garaged at her summer home in Indiana, and that this continued to be the case until 1998. Ms. Racanelli only saw the car twice: the first time when Ms. Loren-Maltese called her down from her office to see the new car before driving it to Indiana, and the second time at the garage next to the town hall about a month later. Commander Gross, the policeman who had the chore of supervising the garage, saw the Allante in Ms. Loren-Maltese's personal parking spot only "several" times in the six months after she first bought it, and then didn't see the car at all after that until 1998 (when it had a vehicle decal from the gated community in Indiana where she had her summer home).

These facts, together with Ms. Loren-Maltese's silence at trial, lead us to find that she personally converted $53,512.40 from the Committeeman Fund to buy a car for her personal use, failed to include that amount as income on her return, and that then caused an understatement of her tax liability. An understatement alone is not enough to show fraud. The Commissioner must provide some evidence to support an inference of fraudulent intent. There is plenty to suggest that not only did Ms. Loren-Maltese understand that she was using campaign funds for personal use, but that she willfully did so with the intent to evade tax she knew would have been due. She was well-advised by the town attorney on the details and importance of titling and tracing funds. She used this

knowledge to hide her use of campaign funds--transferring money from the Organization Fund (which had a reporting requirement) to the Committeeman Fund (which until the end of 1995 did not). Moreover, once the political winds shifted, Ms. Loren-Maltese asked Commander Gross to garage the car at his home from 1998 until 2000 or 2001--after the Chicago Sun-Times named her as the target of a federal investigation, and after she learned that Charles Schneider (one of her alleged co-conspirators) had been served with a grand-jury subpoena.

We therefore find that the Commissioner has shown by clear and convincing evidence that Ms. Loren-Maltese's understatement of income was due to fraud.

B.    The Golf Course

Once the Commissioner has established fraud for one portion of the understatement, the burden shifts to the taxpayer to show by a preponderance of the evidence that other parts of the understatement aren't also due to fraud. Sec. 6663(b); Bussell v. Commissioner, T.C. Memo. 2005-77, 2005 WL 775755, at *13, aff'd, 262 Fed. Appx. 770 (9th Cir. 2007).

The other part of the asserted understatement in this case comes from Ms. Loren-Maltese's investment in the Four Seasons, a historic resort and golf course located on Miscauno Island, Wisconsin. In 1993, however, it badly needed substantial renovation to regain its old glory--and the money for the work came

from Specialty Risk Consultants,[8] Plaza Partners[9] (which owned the Four Seasons),

Miscauno Management (which managed the resort), and also from loans by Ms.

Loren-Maltese and others.

Plaza Partners bought the Four Seasons Golf Course from Miscauno

Management on December 2, 1993. Ms. Loren-Maltese went with Gregory Ross,

John LaGiglio, and Michael Spano, Sr. to see if it would be a good investment.[10]

Between July and September of 1994 Ms. Loren-Maltese gave Mr. LaGiglio three

---

[8] The money from the Specialty Risk Consultant bank account came from payments the Town received to administer insurance claims of its employees. United States v. Spano, 421 F.3d 599, 602 (7th Cir. 2005).

[9] Plaza Partners was created on October 17, 1992, to serve as a nominee for Messrs. John LaGiglio and Frank Taylor (who were also convicted for their role in operating Specialty Risk Consultants, which was the insurance administrator for Cicero, and the key organization in defrauding the Town of more than $10 million). Both men needed nominees to disguise their interest in various investments, as they had trouble with the IRS, so they put their partnership interests in their wives' names. See Spano, 421 F.3d at 604; Plea Agreement at 7, United States v. Taylor, No. 1:01-cr-348-10 (N.D. Ill. Apr. 24, 2002), ECF No. 161.

[10] Mr. Ross was a former special agent with the IRS, and a co-conspirator turned government witness. See Plea Agreement, United States v. Ross, No. 1:01-cr-348-8 (N.D. Ill. May 13, 2002), ECF No. 195; Plea Agreement, United States v. Ross, No. 1:00-cr-734 (N.D. Ill. Apr. 19, 2002), ECF No. 35; Plea Agreement, United States v. Ross, No. 1:01-cr-30-5 (N.D. Ill. Feb. 14, 2002), ECF No. 145. He, Mr. LaGiglio, and Mr. Spano were also convicted for their participation in the insurance-fraud scheme that ensnared Ms. Loren-Maltese.

checks totaling $300,000 that she drew on the Committeeman Fund's account. All these checks were for investment in the Four Seasons.

The investment was memorialized in a promissory note dated January 11, 1994; a nominee agreement executed by Ms. Loren-Maltese dated November 1, 1994; and a mortgage on the Four Seasons dated November 28, 1994. All these documents identify Ms. Loren-Maltese in her personal capacity only--there is no mention of her in any representative capacity, much less as an officer or agent of the Committeeman Fund. This is striking when one notices that the other investors (such as Specialty Risk Consultants) were identified in their respective promissory notes as holding interests as partnerships. The documents also show that the deal was meticulously researched and carefully drafted. The investors even commissioned research into a complicated question of Wisconsin law of whether multiple parties who share a mortgage can have equal priority in the event of a default. The lawyers who did the research carefully noted the names of the parties involved, their legal capacities, and the amounts of their investments.

These notes and other documents show that Ms. Loren-Maltese gave Mr. LaGiglio a check for $100,000 that was drawn on the Committeeman Fund in July 1994 and that she personally signed that check. Mr. LaGiglio deposited it into Plaza Partners' account the next day. On July 20, 1994, Ms. Loren-Maltese

withdrew $250,000 from the Organization Fund account and deposited it in the Committeeman Fund account, and later that day Ms. Loren-Maltese gave Mr. LaGiglio a check drawn on the Committeeman Fund for $100,000 which he deposited in the Plaza Partners account. Two months later, Ms. Loren-Maltese gave Mr. LaGiglio another check for $100,000 drawn on the Committeeman Fund, which he deposited into Miscauno Management. This leads us to find that Ms. Loren-Maltese financed this investment with campaign money, but when payments were made in partial satisfaction of the resulting debt they were made to Ms. Loren-Maltese personally. This was again in contrast to other checks in the record, for instance those written by Specialty Risk Consultants[11] to Ms. Loren-Maltese as political contributions, which were written to her as "Betty Loren-Maltese, Committeeman," "The Committee to Elect Betty Loren-Maltese," or written directly to the Committeeman Fund, but were *not* written to Ms. Loren-Maltese personally.

There is one important quibble. Although Ms. Loren-Maltese's promissory note is for $500,000, which is the amount the Government argued during the criminal investigation was her total investment in the property. After her two

---

[11] At some point after the promissory note was signed, ownership of the Four Seasons was transferred to Specialty Risk Consultants.

criminal trials, however, the Commissioner limits his argument to the $300,000 that he can trace to withdrawals in 1994 from the Funds that Ms. Loren-Maltese controlled.

Ms. Loren-Maltese fails to carry her burden to establish by a preponderance of the evidence that the understatement of income arising from the Four Seasons investment wasn't done with fraudulent intent. Ms. Loren-Maltese argues that the repayments support her contention that this was an investment on behalf of the Committeeman Fund. But we find that the timing of the partial repayments[12] is actually more consistent with trying to conceal fraud. The terms of the promissory note required monthly payments much earlier than when the first one was made, with interest and a late fee.[13] But the checks were issued only after a grand-jury subpoena for information and documents relating to investments made in the Four

_____

[12] A total of $271,925.32 was repaid in three checks issued by Specialty Risk Consultants: $150,000 on January 5, 1996, and two checks for $75,000 and $46,925.32 on October 18, 1996. The checks were payable to Betty Loren-Maltese, and she later (on February 5 and October 21, 1996, respectively) signed them over to the Committeeman Fund.

[13] The first payment, of interest from October 1, 1994, through March 31, 1995, was due on April 1, 1995, and monthly installments of interest and principal should have begun on May 1, 1995, and continued until October 1, 1995. The promissory note provided for a 5% late fee for any payment not received by five business days after its due date.

Seasons was served on Mr. Schneider and Specialty Risk Consultants in September 1995.

Ms. Loren-Maltese's claim is also inconsistent with her treatment of the investment on her Form D-2s.[14] The chicanery with these financial reports (which overstate the amount of money available to the Committeeman Fund) also suggests fraud:

| D-2 period | Amount reported on Form D-2 as of first date of reporting period | Actual amount available Committeeman Fund Bank statements | Difference |
|---|---|---|---|
| 11/8 - 12/31/1995 | $787,669.00 | $474,063.18 | $313,605.82 |
| 1/1 - 6/30/1996 | 813,316.00[15] | 449,570.18 | 363,745.82 |

---

[14] Form D-2, Report of Campaign Contributions and Expenditures, is the name of the form political committees use in Illinois to report their assets, contributions, and expenses. "A Guide to Campaign Disclosure", Illinois State Board of Elections, 14 (Mar. 2012), http://www.elections.il.gov/downloads/campaigndisclosure/pdf/campdiscguide.pdf.

[15] Ms. Loren-Maltese filed two Forms D-2 that allegedly detail the amount of the Committeeman Fund's assets on January 1, 1996: one, a pre-election report for the period of January 1, 1996, through February 18, 1996, filed on March 1, 1996, and claiming assets of $777,162, and another, a semi-annual report for the period January 1, 1996, through June 30, 1996, filed on October 17, 1996, claiming assets of $813,316. This unexplained $36,000 discrepancy underscores how unbelievable the Committeeman Fund's Forms D-2 are.

| | | | |
|---|---|---|---|
| 7/1 - 12/31/1996 | 968,301.00 | 766,081.49 | 202,219.51 |
| 1/1 - 6/30/1997 | 978,275.35 | 900,025.14 | 78,250.21 |
| 7/1 - 12/31/1997 | 557,941.49 | 483,229.06 | 74,712.43 |

Ms. Loren-Maltese argued at length during her second criminal trial that the difference between the reported assets and the actual account balances of the Committeeman Fund represented the amount of the loan balance on the Four Seasons investment. This explanation makes no sense: The Committeeman Fund's share of the loan was supposedly $300,000, and at the beginning of January 1996 no payments had yet been made, but the difference between the Fund's reported assets and cash-on-hand was still more than $50,000 greater than the amount of the loan. And the difference continued to fluctuate even *after* Ms. Loren-Maltese reimbursed the Fund in 1996. Ms. Loren-Maltese nevertheless argues that the reported assets and the cash-on-hand between the end-of-year 1996 and midyear 1997 reports is due to the $150,000 and the $75,000 repayments. Again, neither the facts nor simple arithmetic supports her argument. By the beginning of the third reporting period she had received a repayment of $150,000 which she deposited in the Committeeman Fund, and by the beginning of the

fourth reporting period she received two payments for $75,000 and $46,925.32. Something is clearly missing.

We draw a negative inference from her taking the Fifth Amendment when asked at trial about whether she knowingly falsified the Forms D-2 to disguise her investment in the Four Seasons. The omissions and inconsistencies in these forms, along with her less-than-credible explanations, flash another badge of fraud, that of implausible explanations.

Her contention that she complied with state reporting requirements and treated the promissory note as an investment is not credible. In 1998 the Form D-2 changed to include an investment schedule, and Ms. Loren-Maltese reported the loan amount's face value as only $75,000 on that schedule. She also reported only some of the repayments on the promissory note. She reported interest received on October 18, 1996, of only $46,925.32. But she failed to report the $75,000 payment she received that same day, as well as the $150,000 payment on January 5, 1996--even though she claims that these payments reduced the loan balance. This is exceptionally suspicious imprecision--especially given the meticulous attention to detail on other expenditures and receipts on the Forms D-2, which include the exact values of keychains, McDonald's meals, and similarly modest expenses.

We therefore find that Ms. Loren-Maltese's treatment of the promissory note from start (the name on the promissory note, mortgage, and nominee agreement) to finish (her treatment on the disclosure on the Forms D-2) is inconsistent with the withdrawal of $300,000 from the Committeeman Fund to invest in the luxury golf course as the Committeeman Fund's own investment. Her attempts to recharacterize this as an investment on behalf of the Fund, rather than a conversion of the Fund's assets to her personal use--an attempt we find she made only after Specialty Risk Consultants received a subpoena--are too little too late, and fail to refute the Commissioner's argument that any understatement of tax flowing from her failure to include the amount of her investment in the Four Seasons as income on her 1994 return was due to fraud.

The Commissioner also reminds us that a taxpayer's level of education and business experience is a factor in figuring out whether a person is acting with fraudulent intent. Niedringhaus, 99 T.C. at 211. Ms. Loren-Maltese is a capable politician who managed the business affairs of the Town. She understood contracts and the importance of title from her experience as a real-estate agent. She understood what a nominee was from her experience as deputy liquor commissioner. She hired attorneys to create the Committeeman Fund and to document the Four Seasons investment. She participated in a complex scheme to

- 26 -

defraud the Town of Cicero of over $10 million, which not only indicates an astute understanding of business affairs, but also a willingness to defraud.

Finally, the record has ample evidence that Ms. Loren-Maltese tried to conceal her activities.  She used the Committeeman Fund to hide her expenditures--and concealing assets is powerful evidence of fraud.  Friedman v. Commissioner, T.C. Memo. 1968-145, aff'd, 421 F.2d 658 (6th Cir. 1970).  She falsified campaign-finance disclosures (the Forms D-2).  She even tried to hide the car itself once she understood she was under federal investigation.

Thus, we find that both items that the government argues Ms. Loren-Maltese should have included in her income, should have been included in her income.  Ms. Loren-Maltese's failure to do so was due to fraud, so the statute of limitations is no bar to assessing this old deficiency.  This means that

Decision will be entered for

respondent.